AMERICAN SAVINGS BANK, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 5750–68—5752–68. Filed July 20, 1971.

---

[1] Cases of the following petitioners are consolidated herewith: Shirley Hagemann and Estate of Harry H. Hagemann, Deceased, Shirley Hagemann, Executrix, docket No. 5751–68; and Carl E. Hagemann and Dorothy Hagemann, docket No. 5752–68.

*Bruce B. Graves* and *Walter R. Brown*, for the petitioners.

*Roy S. Fischbeck*, for the respondent.

FAY, *Judge:* Due to common issues, three cases have been consolidated for purposes of trial, briefing, and opinion. Respondent asserts deficiencies in petitioners' income taxes as follows:

| Petitioners | Deficiency | | |
|---|---|---|---|
| | 1963 | 1964 | 1965 |
| American Savings Bank | $1,620.00 | $3,200.00 | $1,750.61 |
| Harry H. Hagemann and Shirley Hagemann | 3,218.82 | 3,252.72 | 3,173.05 |
| Carl E. Hagemann and Dorothy Hagemann | 3,191.59 | 3,279.17 | 3,162.90 |

The following questions must be decided by this Court:

(1) Are the payments made by American Savings Bank to Cedar Investment Co. for management services actually performed by Harry and Carl Hagemann taxable to Harry and Carl Hagemann as individuals rather than to Cedar Investment Co.;

(2) Are commissions on the sale of insurance paid to Cedar Investment Co. taxable to petitioners Harry and Carl Hagemann; and

(3) Are the payments made by American Savings Bank to Cedar Investment Co. for management services rendered by Harry and Carl Hagemann deductible by American Savings Bank as ordinary and necessary business expenses.

With regard to the first two issues, both parties rely exclusively on the applicability or nonapplicability of section 61(a).[2]

### FINDINGS OF FACT

Some of the facts have been stipulated and are, together with the exhibits attached to the stipulation, incorporated herein by this reference.

Harry H. Hageman (hereinafter referred to as Harry) and Shirley Hagemann are husband and wife and filed joint income tax returns for taxable years 1963, 1964, and 1965 with the district director of internal revenue, Des Moines, Iowa. At the time of filing the petition herein, they resided in Waverly, Iowa. Shirley Hagemann is a party to this action only by virtue of having filed joint returns.

[2] All statutory references are to the Internal Revenue Code of 1954, unless otherwise indicated.

Carl E. Hagemann (hereinafter referred to as Carl) and Dorthy Hagemann were husband and wife and filed joint income tax returns for taxable years 1963, 1964, and 1965 with the district director of internal revenue, Des Moines, Iowa. At the time of filing their petition in this case, they resided in Waverly, Iowa. Dorothy Hagemann is a party to this action only by virtue of having filed joint returns.

Harry and Carl are cousins and at all times material herein were partners in the law firm of Hagemann & Hagemann located in Waverly, Iowa.

American Savings Bank (sometimes referred to hereafter as American) was incorporated under the laws of the State of Iowa on January 10, 1899. At all times material hereto, it was a State savings bank with its principal place of business in Tripoli, Iowa, a town of approximately 1,200 inhabitants. American filed corporate income tax returns for taxable years 1963, 1964, and 1965 with the district director of internal revenue, Des Moines, Iowa.

American had 500 shares of common stock issued and outstanding, of which Carl and Harry owned 126 and 125 shares, respectively. Carl was elected to the board of directors of American on October 3, 1960, and Harry on January 10, 1961. Both continued to serve throughout the years at issue. On January 9, 1962, Carl became chairman of the board of American and received as compensation $400 per month. While he continued as chairman through the years in controversy, he received the above salary only through 1962, after which he was paid no salary. Both Harry and Carl received director's fees during the years in issue in an amount never exceeding $25 per meeting.[3] The board normally held one meeting per month and in addition to Carl and Harry was composed of R. L. Cousin, R. R. Downing, August Krueger, Melvin Krumm, and E. H. Stehn. In addition to serving on the board, Melvin Krumm was employed as the executive vice president of American, a position giving him responsibility for the everyday operation of the bank. Prior to becoming associated with American in August 1961, Melvin Krumm had been employed for approximately 15 years with the Swea City Bank in Swea City, Iowa. His duties there consisted of approving routine loans, purchasing and selling investments under the guidance of senior officers, and supervising the everyday operations of the bank.

Harry has been engaged in the active practice of law with the firm of Hagemann & Hagemann since his graduation from law school in 1926. In addition, he has performed extensive services outside the law firm. From 1946 until his retirement in 1965 he served as general coun-

---

[3] Carl received no director's fees during the year 1962 when he was paid $400 per month.

sel for the Lutheran Mutual Life Insurance Co. (hereinafter referred to as Lutheran), Waverly, Iowa. In this capacity he served on Lutheran's investment committee from 1946 to 1965 and on the executive committee from 1962 to 1965. In 1963 Harry was elected vice president of Lutheran and served in the dual capacity of vice president and general counsel until his retirement in 1965. His duties with Lutheran entailed, among other things, advice and approval on investing the company's funds in bonds and mortages. Lutheran had total assets on December 31, 1964, of $171,351,133.10.

Harry also served as a member of the Iowa State Board of Regents from 1951 until 1963 and spent approximately 90 days a year tending to the affairs of the State-supported colleges of Iowa. In 1955 Harry was elected to the board of directors of the State Bank of Waverly.[4] He has continued as a board member to the present time and at no time prior to 1966 served as an officer of that bank. The State Bank of Waverly was organized and incorporated under the laws of the State of Iowa in 1889 and is engaged in general banking business. At all times relevant herein, the bank had 2000 shares of common stock outstanding, of which Harry held 349.82 shares. Harry received no salary for his services as director and received as director's fees an amount not exceeding $25 per meeting of the board.

In 1963, Harry was elected to the board of directors of the Denver Savings Bank located in Denver, Iowa, and has continued as a board member until the present. The Denver Savings Bank is a State bank engaged in the general banking business and at all times material herein had 1,000 shares of common stock outstanding. During the years in issue, Harry owned 184 shares of stock in the bank but at no time did he serve as an officer.

Harry also held stock in the First National Bank of Waverly, a national bank engaged in the general banking business in Waverly, Iowa. His holdings consisted of 97 shares of a total of 12,500 shares outstanding.

Carl E. Hagemann joined the law firm of Hagemann & Hagemann in 1931. In addition, he has served as a member of the board of directors of Lutheran from 1947 to the present. In 1952 Carl became a member of the board of directors of the State Bank of Waverly and has so served up to the present. He was elected president of the bank in 1954 and likewise has retained that position to the present. While solely a member of the board, he received a director's fee of $25 per monthly meeting. After his election as president, he received an annual salary which during the years 1963, 1964, and 1965 amounted to $20,000, $20,000, and $22,000, respectively. On or about December 27, 1962, Carl

---

[4] The State Bank of Waverly is located in Waverly, Iowa, a community situated approximately 17 miles from Tripoli, Iowa.

held 488.63 of the 2000 outstanding shares of stock of the bank. At no time relevant herein did Carl and Harry, individually or collectively, hold a controlling interest in the State Bank of Waverly.

In 1963, Carl also was elected to the board of directors of the Denver Savings Bank. He has continued to so serve to the present, but at no time relevant herein has he served as an officer. Like Harry, Carl owned 184 shares of the 1,000 outstanding shares of the Denver Savings Bank.

Carl also was a stockholder in the First National Bank of Waverly, owning 269 of the 12,500 shares outstanding, but has served neither as a member of the board nor as an officer.

The value of the investments of Harry and Carl in the stock of the above-mentioned banks is reflected by the approximate book value per share at the end of 1962, as follows:

|  | Per share |
|---|---|
| American Savings Bank | $435 |
| State Bank of Waverly | 370 |
| Denver Savings Bank | 250 |
| First National Bank of Waverly | 70 |

To finance the acquisition of their bank stockholdings from time to time prior to 1962 Carl and Harry each borrowed sums of money from the Continental Illinois National Bank & Trust Co. of Chicago (referred to hereafter as Continental). The loans were personal loans secured by pledges of certain of the bank stocks held by the borrowers and evidenced by written promissory notes. On December 27, 1962, Harry and Carl each had an outstanding balance of their obligations of $67,000. This balance is reflected in written promissory notes bearing the above date and said notes represent renewals of previously executed notes. Each $67,000 note was secured by the borrower pledging 249 shares of the common stock of the State Bank of Waverly and 120 shares of the common stock of the American Savings Bank. Both notes were to mature on June 27, 1963, 6 months from their execution.

On January 1, 1958, Harry and Carl formed as equal partners a partnership under the name of Cedar Investment Co. (referred to as the partnership). The business of the partnership consisted of acting as agent for the sale of insurance for National Fidelity Life Insurance Co. of Kansas City and Western Mutual Insurance Co. of Des Moines.

On January 13, 1959, an agreement entitled "Agents Home-Saver Series Contract" was executed by National Fidelity Life Insurance Co. and the partnership by Carl. Under such contract, the National Fidelity Life Insurance Co. authorized the partnership to solicit applications for life and accident and health insurance policies of the "Home-Saver Series" in the vicinity of Waverly, Iowa, and National Fidelity agreed to pay the partnership commissions from the

premiums collected on the insurance written. Insurance written under the "Home-Saver Series" consisted exclusively of mortgage protection insurance written in connection with real estate mortgage loans.

On February 5, 1962, a similar "Agents Home-Saver Series Contract" was entered into by National Fidelity Life Insurance Co. and Melvin Krumm. Such contract authorized the solicitation of applications for life and accident and health insurance policies of the "Home-Saver Series" in the vicinity of Tripoli, Iowa.

On March 3, 1960, another type of insurance contract (hereinafter referred to as a credit life contract) was executed by National Fidelity Life Insurance Co. and the partnership, by Carl. Under such contract, the National Fidelity Life Insurance Co. authorized the partnership to issue policies of credit life insurance and credit accident and health insurance on debtors of the State Bank of Waverly. Pursuant to this contract, both credit life and credit accident and health insurance were written on a group basis in connection with installment loans.

On October 5, 1961, a similar credit life contract was executed by National Fidelity Life Insurance Co. and the partnership, by Carl. Such contract authorized the partnership to issue policies of credit life and credit accident and health insurance on installment loan debtors of the American Savings Bank at Tripoli, Iowa.

On April 15, 1959, an agreement entitled "Agency Contract" was executed by Western Mutual Insurance Co. and by Carl and Harry. Insurance written under the Western Mutual contract consisted entirely of property insurance, and no credit life or credit accident and health insurance was written under such contract.

During the years 1960 through 1962, the partnership's gross receipts consisted solely of insurance commissions from the sale of insurance by licensed insurance agents, all of whom except Harry were officers of either the American Savings Bank or the State Bank of Waverly. During the years 1960 through 1965, no one other than Melvin Krumm wrote insurance upon the premises of the American Savings Bank of Tripoli, Iowa. Insurance policies written on the premises of the State Bank of Waverly were for the most part written by R. L. Cousin and R. R. Downing. While Carl occasionally undertook the writing of a policy, Harry only did so on rare occasions. By agreements between the partnership and the participating licensed insurance agents, insurance commissions originating upon the premises of the State Bank of Waverly were periodically distributed one-half to the partnership and one-fourth each to R.R. Downing and to R. L. Cousin, vice president and cashier of the State Bank of Waverly, respectively, and commissions originating upon the premises of the American Savings Bank

were periodically distributed one-half to the partnership and one-half to Melvin Krumm, executive vice president of the American Savings Bank.[5]

In its partnership income tax returns, Form 1065, filed for the taxable years 1960, 1961, and 1962, the partnership reported as gross income the gross amount of commissions generated under the insurance contracts referred to above. In such partnership returns, the partnership also claimed as deductions the commissions paid to its licensed insurance agents, and the resultant net income was derived equally between the partners, Harry and Carl.

The partnership's U.S. Partnership Returns of Income for the calendar years 1960 through 1962 reflect gross receipts from insurance commissions and partnership income as follows:

| Year | Gross receipts from insurance commissions | Income |
|---|---|---|
| 1960 | $10,639.57 | $5,319.77 |
| 1961 | 15,110.76 | 7,555.65 |
| 1962 | 10,412.67 | 5,206.35 |

Two of the contracts set out above between the insurance companies and the partnership contained an express provision prohibiting the assignment of the contract without the written consent of the particular insurance company involved. Two others, executed on March 3, 1960, and October 5, 1961, contained provisions requiring written permission to alter or amend the terms of the agreement.[6]

In December 1959 Harry and Carl executed articles of incorporation forming a corporation named Cedar Investment Co. (referred to hereafter as Cedar or the corporation). The articles were filed with the secretary of the State of Iowa on December 31, 1959. From December 28, 1962, through the years in issue, Carl served as president and secretary of the corporation and Harry as the vice president and treasurer.[7] During this period Carl and Harry served as Cedar's only directors. The principal purposes for forming the corporation were threefold. First, by creating an entity which assumed their liabilities to Continental, Carl and Harry were relieved of all personal liability. Second, by transferring a portion of the bank stocks held by Carl and Harry to the corporation they thereby created large blocks of

---

[5] Melvin Krumm, R. R. Downing, and R. L. Cousin, as well as Carl and Harry, were all licensed insurance agents. The boards of directors of both American Savings and State Bank of Waverly authorized their officers and employees to sell insurance for their individual profit.

[6] The record fails to disclose whether the Feb. 5, 1962, contract contained any limitation similar to those in the other four agreements.

[7] The parties stipulated that Harry and Carl were officers from Jan. 1, 1960, through the years in issue. The corporate minutes of the Dec. 28, 1962, meeting of Cedar's board of directors reveal that they were not actually elected until that date.

stock that would bring a higher value both for security and sales purposes. And, lastly, the corporation furnished Carl and Harry a vehicle with which to purchase additional bank stocks while avoiding personal liability on the financing of future acquisitions.

A secondary but significant motivation for forming the corporation was to provide for continuity in the operation of the insurance business should either Carl or Harry, both of whom were over 60 years old, suffer an untimely death.

From January 1, 1960, until December 28, 1962, Cedar neither conducted any business nor issued any stock. On the latter date Cedar entered into an argreement with Carl and Harry under which Cedar assumed the two $67,000 outstanding obligations of the individuals and issued 214 shares of its stock (107 to Carl and 107 to Harry) in return for the transfer to the corporation of 498 shares of State Bank of Waverly stock and 240 shares of American Savings Bank stock, one-half of each transfer consisting of stock owned by Harry and one-half by Carl. Under the same agreement, for a consideration of $1 Harry and Carl transferred to the corporation the insurance business heretofore operated by the Cedar Investment Co. partnership. No consent was received from the insurance companies relating to this transfer nor were they notified until sometime immediately prior to the trial of this case.

Upon Cedar's assumption of the two $67,000 liabilities secured by the 498 shares of State Bank of Waverly stock and 240 shares of American Savings Bank stock, Continental released both Carl and Harry from all personal liability on the notes.

From January 3, 1963, until the maturity dates of the two notes on June 27, 1963, Cedar made the following principal and interest payments on the notes:

| | |
|---|---|
| Jan. 3, 1963 | $2,988.00 |
| May 10, 1963 | 4,000.00 |
| June 26, 1963 | 2,961.52 |

On June 27, 1963, Cedar executed a promissory note payable in 6 months to Continental in the amount of $127,012 with interest at 4½ percent until maturity and 7 percent thereafter until paid. This note was accepted by Continental as a replacement for the two notes previously executed by Carl and Harry with the amount representing the combined outstanding balance of the notes. The note was secured by the same bank stock as had secured the prior obligations. During period November 7, 1963, through December 31, 1965, Cedar made payments of principal and interest on the June 27, 1963, note and its subsequent renewal notes, as follows:

| | | |
|---|---|---|
| Nov. 7, 1963___ $4,000.00 | July 7, 1964___ $4,000.00 | June 22, 1965__ $2,411.66 |
| Dec. 30, 1963__ 2,880.90 | Nov. 18, 1964__ 3,900.00 | July 3, 1965___ 4,000.00 |
| Jan. 6, 1964___ 5,000.00 | Dec. 28, 1964__ 2,593.51 | Oct. 20, 1965__ 3,400.00 |
| June 22, 1964__ 2,735.90 | Jan. 15, 1965__ 4,612.00 | Dec. 28, 1965__ 2,295.99 |

The operation of the insurance business, after transfer from the partnership to the corporation on December 28, 1962, remained substantially the same. The actual sales were still made primarily by R. L. Cousin and R. R. Downing at the State Bank of Waverly and by Melvin Krumm at the American Savings Bank. Commissions received from the sale of insurance were deposited in accounts of Cedar in either the State Bank of Waverly or the American Savings Bank, depending on whose premises the policies had been written. The personnel of both banks involved with writing the policies were aware of the transfer of the business to Cedar and after said transfer considered themselves agents of the corporation. The division of the gross commissions remained as they were prior to the transfer, i.e., on policies written at the State Bank of Waverly the commissions were divided one-fourth each to R. L. Cousin and R. R. Downing and one-half to the corporation, and on policies written at the American Savings Bank one-half to Melvin Krumm and one-half to the corporation. The net commissions ultimately received by the corporation were reported as income on its corporate income tax returns for the years in question. No distribution of the commission income was ever made by Cedar to Harry or Carl, its only shareholders. All of the income generated by the sales of insurance, together with fees received pursuant to the management services agreement set out *infra*, were used by Cedar to make payments of principal and interest on the assumed $134,000 liability.

On January 8, 1963, Cedar entered into an agreement with the American Savings Bank.[8] This agreement provided that in return for a fee of $450 per month Cedar would render management services to American, as follows:

(a) Examine and analyze the present banking practices of the American Savings Bank, in connection with the holding and the building up of its loan portfolio and the procedures and methods for the operation of an expanded installment loan department.

(b) Examine and analyze the bank's safety deposit operations and equipment and make suggestions as to the modernization of the methods to be followed to minimize the Bank's liability in connection therewith.

(c) Examine and analyze present practices of the Bank and make suggestions in connection with other major management matters, such as service charges, interest on savings accounts, compensation of officers, changes in capital structure and investment of funds, as they may deem fit and proper for the improvement of the banking operations.

---

[8] Pursuant to the terms of the agreement, it was made retroactive to cover the period from Jan. 1, 1963 (the date American commenced receiving management services), until terminated by the parties.

(d) Consult with the officers and directors of the bank in connection with mechanical improvements in the various departments of the Bank and the improvement and modernization of its quarters, and in connection with any other phases of its banking operation which they may deem proper and in connection with which the officers and directors may seek advice.

The agreement was approved by the directors of both Cedar and American at meetings of the respective boards on January 8, 1963.

This agreement is of a type frequently employed by banks in the State of Iowa and its provisions are those ordinarily found in such contracts.

During 1963, 1964, and 1965 Carl and Harry performed certain services for American. In addition to attending regular meetings of the board of directors, Carl spent approximately 25 to 30 hours per month performing services while Harry spent 10 to 20 hours. The services actually rendered by Carl and Harry consisted of the following:

1. Review and make recommendations for revising the bank's investment portfolio.

2. Make recommendations resulting in the purchase of new mechanical equipment.

3. Review the bank's checking account operation instituting a new service charge policy.

4. Extensive investigation and study relative to the needs and desirability of an increased physical plant and in what form that increase should be accomplished.

5. Recommend that the previously restrictive loan policies be liberalized and expanded to include real estate mortgage loans.

6. Act as liaison for the bank with the State Superintendent of the Iowa Department of Banking.

7. Generally assist Mr. Krumm, the bank's executive officer, in matters of improving bookkeeping methods, watching the cash flow, and handling personnel.

In return for the above services, American paid to Cedar $5,400 in 1963 and $6,400 in both 1964 and 1965. The increase of $1,000 in the latter 2 years represented a bonus voted by American's board of directors on account of the rise in profits they felt were attributable to the management services. At no time, however, did Cedar pay either Harry or Carl wages or a salary nor was there any contracts or other agreement of employment.

Respondent has asserted deficiencies against Carl and Harry on the basis that both the commissions on insurance and the management services fee were taxable not to Cedar but one-half to Carl and one-half to Harry as individuals. In addition, respondent has asserted a deficiency against American on the basis that the payments made to Cedar for services performed by Carl and Harry were unreasonable compen-

sation since said services were no more than are ordinarily expected from members of the bank's board of directors.

The issues to be decided are whether petitioners Harry and Carl are taxable on the payments made by American to Cedar for management services and on one-half of the insurance commissions generated by the sale of insurance on the premises of both American and the State Bank of Waverly. In addition, we must decide whether the fees paid by American for management services are deductible as ordinary and necessary business expenses.

Respondent's determination of deficiencies with respect to both the management fees and the insurance commissions is based, in part at least, on an attack on the validity of the Cedar Investment Co. corporation. Respondent claims that Cedar neither carried on any business activity to which either of the income sources can be attributed nor was it formed for any legitimate business purpose. Consequently, respondent concludes, the corporation could not have earned the income in question and, in any case, should be disregarded for tax purposes.

We think it necessary to decide at the outset the question of Cedar's validity for tax purposes. It is clear that a corporation, even though duly organized under the laws of a State, is subject to attack and the concommitant consequences if it is found to be no more than a vehicle for tax avoidance and void of any other legitimate business purpose. *Gregory* v. *Helvering*, 293 U.S. 465 (1935); *Aldon Homes, Inc.*, 33 T.C. 582 (1959). It is equally true, on the other hand, that a corporation formed for a legitimate business purpose and conducting business activity must be recognized as a separate taxable entity. *Moline Properties* v. *Commissioner*, 319 U.S. 436 (1943); *Ernest H. Weigman*, 47 T.C. 596 (1967), affirmed per curiam 400 F.2d 584 (C.A. 9, 1968); *Sam Siegel*, 45 T.C. 566 (1966).

In the present case, the record establishes that Cedar was not only formed for a substantial business purpose but in fact conducted substantial business activity during the years in question. The relief from personal liability on sizable financial obligations together with long-range plans of future bank stock acquisitions by the corporation is not overwhelmingly convincing of the requisite business purpose. However, when coupled with Carl and Harry's desire to provide for continuity in the operation of the insurance business, the making of large financial commitments to Continental replacing those of Carl and Harry, and the making of regular payments in satisfaction of those obligations, there can be no doubt that Cedar is not a sham or

mere "dummy" corporation and that it must be recognized as a separate taxable entity. Moreover, the actual operation of the insurance business by Cedar during 1963 through 1965[9] further confirms the validity of the corporation for tax purposes.

Respondent points to a number of factors as supporting his assertion that the corporation conducted no business activity. That Cedar operated without employees, a separate office, a telephone, advertising, and a complete set of books and records is not conclusive on the issue of whether it actually conducted business activity. Where, as here, business was conducted through agents and an accurate record of income and disbursements was kept primarily with check stubs, the absence of the factors relied on by respondent does not justify ignoring that business operations were in fact being conducted.

Since Cedar is in our view a valid taxable entity, we now must decide whether there is merit to respondent's argument that both the insurance commissions and management fees paid to Cedar are taxable to Carl and Harry on assignment of income principles.[10] The well-seasoned case of *Lucas* v. *Earl*, 281 U.S. 111 (1930), and its progeny have caused the proposition that income is taxed to the person who earned it to become an axiom of tax law. The more difficult question, often shrouded in confusion, is the determination of who, in fact, is the real earner of the income. This determination is made no easier by tax laws that permit the conceptually difficult arrangement where an individual performs services thereby earning the income that is received and the next day performs the same services and the compensation, when paid to a corporation wholly owned by that individual, is said to have been earned by the corporation. The patent artificiality of such a situation leads this Court to carefully scrutinize any such arrangement to assure that an individual is not merely siphoning off income to another entity at the expense of the public fisc.

In resolving a dispute over the identity of the true earner of income, we look to who controls the earning of the income. After examining all of the surrounding facts and circumstances, we are persuaded that control over the earning of the insurance commissions clearly rested in the Cedar corporation. Nearly all of the commissions paid to Cedar were generated by policy sales made by Krumm, Cousin, and Downing, all of whom considered themselves agents of the corporation. The contracts whereby the insurers authorized the sale of insurance were with Cedar rather than the individuals and it was within Cedar's power to permit or prohibit agents from selling insurance.

---

[9] The operation of the insurance business by Cedar will be dealt with in more detail *infra*.

[10] The parties having expressly disclaimed any reliance on sec. 482, its applicability to the facts before us is not in issue. It appears, however, that an allocation under that section would produce a result substantially identical to that reached herein.

Even in the limited instances in which policies were written by Carl and Harry, they (as individuals) were acting as agents of the corporation and under its control. All commissions paid to Cedar by the insurance companies were initially deposited in its bank account and subsequently partially distributed to the principal agents. Harry and Carl's part in the insurance operations was limited to the infrequent writing of policies at one of the two banks involved. True, they may have exerted some influence over the writing of policies but this was possible only in their capacity as officers and directors of Cedar. Any decision to alter the operation had to be made by the corporation which not only had the contracts authorizing the sale of insurance but was also the recognized principal of the agents who were actually writing the bulk of the policies.

A review of the entire record reveals that the earning of the insurance commissions involved herein was controlled by the Cedar corporation. All of respondent's arguments to the contrary have been carefully considered and found to be without merit. We therefore conclude that the net amount of the commissions is properly includable in Cedar's gross income. See *Van Meter* v. *Commissioner*, 61 F.2d 817 (C.A. 8, 1932).

Respondent cites us the cases of *Jack E. Morrison*, 54 T.C. 758 (1970); *Jerome J. Roubik*, 53 T.C. 365 (1969); and *Lloyd F. Noonan*, 52 T.C. 907 (1969) (on appeal Mar. 23 and Apr. 22, 1970, C.A. 9), as authority for taxing the insurance commissions to the individual petitioners herein. All three cases are distinguishable in at least two vital respects. First, the Government's attack on the validity of the corporations as separate taxable entities in each of the three cited cases was sustained by the Court. The corporate form was found to be no more than a bare skeleton with avoidance of taxes being its sole purpose. Such a conclusion leaves the actual performers of the services as the obvious earners of any income and consequently resulted in the individuals there in question being taxed. The question is quite different where, as in the present case, the corporation involved is an active viable entity and warrants recognition for tax purposes. In a situation such as this, it is necessary to carefully scrutinize both entities involved, the corporation and the individuals, and determine which of the two earned the income. This conveniently brings us to the second basis for distinguishing this case from each of the other three. In *Morrison*, *Roubik*, and *Noonan*, the taxpayers in question were the individuals actually performing the services and generating the income. Here, on the other hand, the income-generating factor is the selling and writing of insurance policies. As pointed out earlier, this function was being performed by three persons (Krumm, Cousin, and Downing) acting independently from the individual peti-

tioners and under the authority, and as agents, of Cedar corporation. In light of these two significant differences between the cited cases and the one at issue, we think it clear that the cited cases are not controlling.

The question of control as it relates to the payments of management services fees is quite another matter. This issue was before us on very similar facts in the recent case of *Richard Rubin*, 51 T.C. 251 (1968), remanded 429 F.2d 650 (C.A. 2, 1970). In *Rubin* the taxpayer was in control of two corporations. Corporation A was in need of management assistance and agreed to pay corporation B a fee in return for the performance of services by Rubin. Rubin was employed by and received a salary from corporation B. Focusing on several factors not particularly pertinent here, we held that Rubin, not corporation B, controlled the earning of the fee, that the individual was therefore the true earner and the income should be taxed to him. In so holding, we were of the opinion that the traditional "loaned employee" cases of *Fontaine Fox*, 37 B.T.A. 271 (1938), and *Charles Laughton*, 40 B.T.A. 101 (1939), remanded 113 F.2d 103 (C.A. 9, 1940), were distinguishable first on the basis that the individuals involved therein were contractually bound to render services exclusively for their employer-corporations and second because the control of both corporations present in *Rubin* was a factor lacking in both of the other cases.

In remanding *Rubin*, the Court of Appeals held that the assignment-of-income doctrine was not applicable to the facts presented and that neither *Fox* nor *Laughton* was properly distinguishable. For the reasons set out hereafter, we think the grounds given by the circuit court for remanding *Rubin* are not controlling here.

The facts of this case clearly make it distinguishable from both *Fox* and *Laughton*. Not only are the two distinguishing factors relied on in *Rubin* present herein, i.e., the absence of exclusiveness and control of both corporations,[11] but here an additional fundamental element is absent. In *Rubin*, *Fox*, and *Laughton*, it was established beyond question that the requisite employment or agency relationship existed between the individual and the lending corporation. In this case, however, there is absolutely no showing that the individuals, Carl and Harry, were either in the employ of Cedar or acting as its agents in rendering management services to American. There is some testimony by both Harry and Carl that they acted as agents of the corporation, but such self-serving testimony has little evidentiary value when stated in conclusory terms, and is given by witnesses who have

---

[11] We think it clear that in addition to controlling Cedar (between Carl and Harry they owned 100 percent of the stock) they also effectively controlled American since between Carl, Harry, and Cedar they voted 251 of 500 shares of American's stock.

the benefit of hindsight. We must contrast these bald assertions of an existing agency relationship with the facts appearing in the record. The absence of any employment relationship, either written or oral, together with no fees, wages, salary, or other payments made by Cedar to the individuals and the lack of any reference to Carl and Harry as agents or employees in Cedar's corporate minutes or other documents, are persuasive factors weighing against the existence of any agency or employment relationship between Cedar and the individuals.

We conclude from the foregoing that Harry and Carl were acting on their own in furnishing the management services in question and not for, or on behalf of, Cedar. They have not shown that a sufficient nexus existed between the individuals and Cedar for this case to fall within the scope of the "loaned employee" cases of *Fox* and *Laughton.* As such, Harry and Carl were the only ones in control of earning the management fees. They could have ceased providing American with management services at any time they chose without any recourse or repercussions from Cedar. While the contract to perform the management services was between Cedar and American, this is not conclusive on the issue of control. It is obvious that the true earners of the income were the individuals and that the contract between American and Cedar was only a part of the vehicle used by Harry and Carl to assign the income earned by them to the corporation. The stress which is put upon the lack of any proven relationship between Carl and Harry and Cedar (related to the management services) in reaching our decision is well placed. In any case involving the assignment of income, the ultimate conclusion is a line-drawing process. The drawing of lines in these cases is a delicate and difficult task. Such a task, however, is facilitated where, as in this case, there is an obvious breach in the relationships of the entities involved that turns the entire focus of who controlled the earning of the income to one of the parties.

It is in this management services setting that one can perceive a close similarity between the individuals involved herein and the taxpayers in *Morrison, Roubik,* and *Noonan.* Once we determine, as we have in this case, that the individuals in question rather than the corporation were the true earners of the income, the principles and results in the cited cases must come into play requiring inclusion of the income by the individuals.

Finally, we must decide whether the payments by American for management services are deductible as ordinary and necessary business expenses under section 162. Respondent contends that the payments were compensation for services normally expected from members of the board of directors, that they are therefore excessive and must be disallowed. We disagree. The test of deductibility of compensation payments is whether they are reasonable and for services actually

rendered. *Perlmutter* v. *Commissioner*, 373 F.2d 45 (C.A. 10, 1967), affirming 44 T.C. 382 (1965). This is a question of fact to be determined from all the facts and circumstances of each particular case. Petitioners have provided us with credible and uncontradicted expert testimony that the services performed by Harry and Carl were over and above those normally expected of directors. The expert also testified that the payments of $5,400, $6,400, and $6,400 in each of the years in question are not only reasonable for the services received, but in fact modest. Even aside from this testimony, we are convinced that the services actually rendered (set out in detail in our Findings of Fact) are atypical of those normally provided by board members. They included background investigation and formulation of proposals to be presented to, and approved or disapproved by, the board. Such services were more in the nature of those performed by management and its staff. Where, as here, a small bank in a small town employs management help within the bank competent only to supervise everyday operations, it is to be expected that the bank may contract with outside sources to provide research and proposals for widespread and sophisticated reforms.

That both Harry and Carl possessed the expertise in business and banking affairs to provide such services is unquestionable. Both of their backgrounds contain vast experience in both banking and investments and make quite clear that their advice and judgment are of substantial value to any financial institution. Respondent emphasizes that several of the services performed by Harry and Carl had been performed by Carl alone prior to 1963. We do not believe that the services provided by Carl alone were as varied or extensive as those performed by the two individuals during the years in question. Even if we did, however, it is quite likely that due to his personal financial interest Carl was providing a service over and above that expected of a director. It is not insignificant that prior to the assumption of the management services by Carl and Harry jointly, Carl received a monthly fee of $400. Subsequent to the initiation of the new arrangement, Carl no longer received fees over and above those paid for the services of a normal director. That he decided to relieve himself of some of the burdens and responsibilities by engaging outside help does not render payment therefor by American unreasonable and not deductible.

In view of the foregoing, it is our conclusion that the insurance commissions were earned by, and includable in the gross income of, the corporation, Cedar Investment Co.; the management services fees were earned by, and includable in the gross income of Carl and Harry, one-half each; and that the management fees paid by American are clearly an ordinary and necessary business expense.

*Decisions will be entered under Rule 50.*