MAX EUGENE BENNINGFIELD, JR., AND SHELLEY JEAN BENNINGFIELD, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5057–82.    Filed September 19, 1983.

Max Eugene Benningfield, Jr., pro se.
*Milton J. Carter, Jr.*, for the respondent.

PARKER, *Judge*: Respondent has determined the following Federal income tax deficiencies and additions to tax:

| Taxpayer | Year | Deficiency | Sec. 6653(a)[1] |
|---|---|---|---|
| Max Eugene Benningfield, Jr. | 1975 | $1,042 | 0 |
| Max Eugene Benningfield, Jr. | 1976 | 164 | 0 |
| Max Eugene Benningfield, Jr., and Shelley Jean Benningfield | 1977 | 1,041 | 0 |
| Max Eugene Benningfield, Jr., and Shelley Jean Benningfield | 1978 | 4,992 | 0 |
| Max Eugene Benningfield, Jr., and Shelley Jean Benningfield | 1979 | 6,784 | $339 |

After numerous concessions,[2] the issues remaining for determination are (1) whether a deduction or exclusion from gross

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect during the taxable years in question, and all references to Rules are to the Tax Court Rules of Practice and Procedure.

[2]Most of the issues involved substantiation of items claimed on the tax returns, and petitioners have now furnished such substantiation. After these concessions, the only remaining deficiencies and additions to tax claimed by respondent are as follows:

| Taxpayer | Year | Deficiency | Sec. 6653(a) |
|---|---|---|---|
| Max Eugene Benningfield, Jr. | 1976 | $164.25 | 0 |
| Max Eugene Benningfield, Jr., and Shelley Jean Benningfield | 1977 | 164.25 | 0 |
| Max Eugene Benningfield, Jr., and Shelley Jean Benningfield | 1979 | 693.50 | $34.67 |

income claimed in 1979 as a "factor discount on receivables sold," which represents petitioner's endorsement of two of his paychecks to "Professional and Technical Services" is allowable; (2) whether a deduction of $3,550 for "financial counseling" is allowable; and (3) whether petitioner is liable for the negligence addition under section 6653(a).

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, first supplemental stipulation of facts, and exhibits attached thereto are incorporated herein by this reference.

Max Eugene Benningfield, Jr., and Shelley Jean Benningfield (petitioners), husband and wife, resided in Selah, Wash., when they filed their petition in this case. During the taxable years 1975 and 1976, petitioner Max Eugene Benningfield, Jr. (petitioner), was unmarried. He filed individual Federal income tax returns for these years. Petitioner is, by trade, a pipefitter or steamfitter.

For the taxable years 1977, 1978, and 1979, petitioners were married and filed joint Federal income tax returns. Petitioners' 1977 and 1978 returns were prepared by an accountant.

Prior to December 25, 1979, petitioner had been hired by and was employed by the J. A. Jones Construction Co. as a steamfitter. On or about December 25, 1979, petitioner signed a document entitled "Intrusted Personal Services Contract" (services contract). The services contract listed petitioner as the "Supplier" and listed as the "Purchaser" one Frank Forrester (Forrester), purporting to act as trustee of "Professional & Technical Services" (PTS). Petitioner signed the services contract in the offices of Trust Trends, whose representative was James C. Russell (Russell). Either Russell or one of his office helpers was present when the services contract was signed. The services contract provided, in pertinent part, as follows:

The deficiencies for 1976 and 1977 involve disallowances by respondent of investment credit carrybacks to those years as a result of the deficiency determination for 1979. Respondent does not dispute the amount of the investment credit allowable in 1979.

In addition to the issues listed in the text, there also is involved an automatic adjustment to petitioner's medical expense deduction under sec. 213. This will be determined by our resolution of the remaining issues for 1979.

## INTRUSTED
## PERSONAL SERVICES CONTRACT

1. Legal Status: This Contract is formed under English Common Law and is protected by Article 1, Sec. 10, Para. 1 of the Constitution of the United States and the Republic de Panama. It is not subject to the trust or contract laws of any state. Any question or interpretation or any claim shall be settled per Rules of the American Arbitration Association. Equity supersedes all laws and court cases.

2. Economic Justifications: This Contract is a combination of personal estate planning and business planning for improved economic and legal reasons. Considerations included are (a) a line of dollar credit on par with equity; (b) advance payments of future monies due; (c) interest-free loans; (d) employment opportunities; (e) job security; (f) tax-free contributions to retirement and pension type plans of $100,000 or more; (g) purchase of cars/boats/planes/equipment/etc. at wholesale prices and without state sales tax; (h) paralegal protection for personal and business assets; (i) financial management consulting aid; (j) analysis of tax consequences of transactions; (k) investment advisory services and statistical research; (l) custodial services; (m) bookkeeping and accounting help; (n) high earning saving plans; (o) preparation of forms and procedures for business transactions; (p) advice on selling real estate, homes, and other assets; (q) helping to perfect title to property presently owned; (r) improving the value of property presently owned; (s) recommendations on using trusts; (t) analysis and consolidation of insurance policies; (u) analysis of tax shelters; (v) provisions of successor trustee management; (w) preparing tax returns; (x) offering use of domestic and foreign banking facilities; (y) serving as collection agency; (z) making escrow facilities available on and off-shore; (aa) promoting more business with national and international contacts.

3. Legal Status of Tax Liability: This contract is legally binding taxwise under the IRS-quoted court case of Earl vs. Lucas, U.S. Supreme Court (1930). As stated by the IRS, this is the governing case law which attaches tax liability to the legal owner of the 'tree' for the 'fruit' of the tree, or as the U.S. Supreme Court held, " * * * that no distinction can be taken *_*_* by which the fruits are attributed to a different tree from that on which they grew." Thus, the "Purchaser" is the legal owner of all the "Supplier's" future accounts receivable capital asset payments generated from the "Supplier's" personal services rendered to third party users/employers/promoters/etc.

4. Best Efforts Basis: "Purchaser" agrees to find suitable and acceptable use of the services and talents of the "Supplier" on a continuous basis or as agreed to by the parties. This is not meant to reduce the power or inhibit the use of collective bargaining agreements and does reserve and impart unto the "Supplier" the right to further such association in the common interest to enrich the fruit.

The "Purchaser" does hereby, acting through its trustee, Frank Forrester, grant and extend to the "Supplier" signed hereon, powers to act as "Purchaser's" true and lawful attorney-in-fact to use "Purchaser's" name, without further notice, in union affiliations, regarding either the above said

fruit or conditions of use of said services and talents. Purchaser does, by above assignment of power of attorney, agree to comply without separate bargaining agreement, as services personage, one with the Supplier, and is not to be regarded in any way as a separate labor contractor having to do with dues, fringes and the like. This Contract does not explicitly require the approval of any outside bargaining group or agent.

5. Rights of "Purchaser": Receive payment for all accounts receivable capital assets purchased.

6. Obligations of "Purchaser": Purchase all accounts receivable capital assets offered by "Supplier". Pay taxable income payments to "Supplier" as agreed, which may be the common payment of $1 per year for patriotic services rendered. Issue requests to all fourth parties repurchasing accounts receivable capital asset payment to contribute 90% or more of payments to one or more private charities, foundations, or other non-profit organizations. Pay all monies due and guaranteed under the Management Warranty Policy included in this Contract.

7. Management Warranty Policy: This Contract incorporates a Management Warranty Policy which provides the following guarantees to the "Supplier": (1) All equity credit accumulated will be distributed without further taxation or costs; (2) All equity credit accumulated will be given away at the sole discretion of the non-profit organizations; (3) All equity credit accumulated will be accumulated in the hands of fifth parties who are valid, in existence, and totally unrelated to any of the 1st, 2nd, 3rd or 4th parties stated hereinabove; (4) All fifth parties are tax-free and offshore.

8. Tax-Free Services: "Purchaser" will endeavor to help "Supplier" to realize benefits from use of tax-exempt organization's services, from tax-sheltered projects, from tax-free sales and exchanges, from off-shore taxfree investments, from gifts/grants/loans from non-profit organizations, from IRS Revenue Rulings (private and nonprivate), from laws and codes, and from any tax-haven operations available.

9. Parties: The "Supplier" of personal services is (name) __Max E. Benningfield Jr.__ of (address) __806 W. 6th Ave.__ (city/state) Please print
__Selah Wa__ (zip) __98942__ (phone) ( ) __697-3783__

The "Purchaser" of said "Supplier" and thus the legal owner and controller of said "Supplier" is Professional Technical Services, a Trust, c/o American Dynamics Corp., Box 11, Cathedral Station, New York, N.Y. 10025.

*     *     *     *     *     *     *

11. Description of "Supplier's" Services to be Rendered: The following type(s) of services may be supplied:

Independent Contractor     _____
(enter type of work either
on Contractor line or Salary line.)
Payroll or Salary     _____ Pipefitter _____

12. Billing of Services: This INTRUSTED PERSONAL SERVICES CONTRACT may be used in conjunction with a USER SERVICES CONTRACT

where labor contractor services are provided and may therewith require submittal of "Purchaser's" invoices which will be prepared on·site by the "Supplier" acting as the 'tree'.

Where timekeeping of the services covered herein is done by the 'User' and no labor contract is expressed, no billing will be necessary. The User will make timely issue of payments (fruit) in the name of the "Supplier" and the "Supplier" may, without inteference from outside parties or claimants, sell such fruit per paragraph 13 below. .

13. Length of Contract: "Purchaser" agrees to purchase the indefinitely continuing services of the "Supplier" which shall include both the 'tree' and the 'fruit' of said "Supplier", so that the "Supplier" has intrusted himself/herself to P&TS in the same manner in which other persons have incorporated themselves. Since P&TS legally owns and controls the 'tree', P&TS also legally owns and controls the 'fruit', so that "Supplier" may sell the 'fruit' and "Purchaser" may buy the 'fruit' as mutually agreeable.

14. Obligations of "Supplier": Sell indefinitely continuing personal services to "Purchaser". Acting as an independent broker/nominee, forward all resold accounts receivable payments (received for personal services rendered to third party users) to the "Purchaser" as agreed or to fourth parties to whom the "Purchaser" has irrevocably resold/assigned/transferred the "Purchaser's" legal and control rights to said accounts receivable capital asset payments.

15. Rights and Privileges of "Supplier": (1) Receive payment of agreed taxable amounts; (2) Receive all available, economic, valuable but nontaxable personal and non-personal considerations for himself/herself, family, friends, and other designated parties; (3) Receive all benefits protected under the Management Warranty Policy incorporated in this Contract.

* * * * * * *

WHEREFORE, this Contract is signed and sealed this 25th___day of December_____, 19 79___.

"Supplier" (S) Max E. Benningfield, Jr.　"Purchaser" (S) Frank Forrester,
　　　　　　　　　　　　　　　　　Trustee Professional &
　　　　　　　　　　　　　　　　　Technical Services

Before entering into this "contract," petitioner did not seek or obtain any legal advice concerning the legal effect or tax consequences of this "contract."

Also, on or about December 25, 1979, petitioner executed a document entitled "PROFITS SAVING PLAN Contract for PURCHASE, ASSIGNMENT, AND RE-PURCHASE OF ACCOUNTS RECEIVABLE." Petitioner also signed this document in Trust Trends' offices, whose representative was Russell. The document was also signed by Forrester. By this document, petitioner purported to sell or assign accounts receivable from "Industrial Heating & Plumbing," a company for which petitioner worked at various times in 1980, to

"International Dynamics, Inc., Trustee" (hereinafter IDI), "c/o American Dynamics Corp., Box 11, Cathedral Station, New York, N.Y. 10025." IDI is purportedly the trustee of the "International Dynamics Trust." American Dynamics Corp. is purportedly IDI's bookkeeper.

During late 1979, petitioner's employer, J. A. Jones Construction Co., issued checks to petitioner in petitioner's own name representing wage payments for services rendered by petitioner. After December 25, 1979, petitioner endorsed over to PTS two paychecks so issued. The checks J. A. Jones issued to petitioner after December 25, 1979, equaled $2,380.63. J. A. Jones had no contract of any type with PTS and did not know of petitioner's "contract" with PTS.

On December 26, 1979, IDI Credit Union of Yakima, Wash., purportedly a Canadian charitable trust, issued a check in the amount of $1,866.43 to petitioner Shelley Jean Benningfield (Mrs. Benningfield). Russell, as assistant cashier, signed the check for IDI Credit Union. The check bore the notation "gift." The same day, Mrs. Benningfield endorsed the check and deposited it into petitioners' joint checking account. On December 29, 1979, IDI Credit Union issued its check No. 351 in the amount of $323.75 to petitioner. Russell, as assistant cashier, signed the check for IDI Credit Union. The check bore the notation "gift." Petitioner Max Benningfield endorsed the check and deposited it into petitioners' joint checking account on December 31, 1979.[3] These two checks from IDI Credit Union totaled $2,190.18, which was 92 percent of the amount of the paychecks petitioner had endorsed over to PTS after December 25, 1979. Although nothing in the written documents in the record required the return to petitioner of any amounts of the paychecks he endorsed to PTS, petitioner fully expected to receive back, and did in fact receive back, 90 percent or more of his paychecks that he endorsed over to PTS.

Also on or about December 29, 1979, petitioner executed a document entitled "CONTRACT for non-business personal Financial Management Consulting Services" (financial man-

---

[3]The deposit into petitioners' joint checking account on Dec. 31, 1979, was $3,518.75, the sum of this $323.75 "gift" and the $3,195 "gift" of 90 percent of the $3,550 petitioners paid to International Dynamics, Inc., for "Financial Counselling" which will be discussed below.

agement contract). IDI was identified in the document as the consultant. The financial management contract provided in pertinent part as follows:

ITEMIZED DEDUCTIONS ON SCHEDULE "A" OF FORM No. 1040

| Contract services | Service for fiscal year 1980 | Fee for year or retainer |
|---|---|---|
| ____ | Investment and statistical research | |
| X | Financial counseling | $1,000 |
| ____ | Custodial provision | |
| ____ | Accounting support | |
| X | Estate planning | 1,000 |
| X | Tax consequence advice and taxes owed | 1,550 |
| ____ | Tax return preparation and refunds due | |
| ____ | Savings club expenses, pro rata | |
| ____ | Collection agency aid | |
| ____ | Financial forms and procedures | |
| ____ | Banking and escrow facilities | |
| ____ | Insurance analysis and consolidation | |
| ____ | Pension design and updating | |
| ____ | Equity trust review with recommendations | |
| ____ | Perfecting title to property presently owned | |
| ____ | Improving value of property presently owned | |
| | Total: | 3,550 |

*Discount option.* Period of time above yearly plan is to continue: one years. Based on prepayment for the number of years chosen, a discount of -0-% shall be allowed.

*Payment.* Fees or retainer is due on the date this Contract is signed by both Parties.

*Consultant's obligations.* Furnish above contracted services in a timely and beneficial manner on a best efforts basis and in a professional way. Only methods and techniques believed to function and to provide an economic advantage to the Client will be recommended. Research and development will be carried out for the mutual progress of all Clients.

Petitioner signed this document in Trust Trends' offices, whose representative was Russell. The document bears the purported signature of Forrester as "Sec'ty for International Dynamics, Inc., Trustee, Consultant." Russell initialed a note at the bottom of this document indicating that petitioner paid by check the total "fee" due on December 29, 1979. The record does not establish that petitioners ever received any services pursuant to the financial management contract.

When petitioner signed the financial management contract, he issued his check number 800, dated December 29, 1979, to IDI in the amount of $3,550.[4] Simultaneously, IDI Credit Union issued to petitioner its check number 350, signed by Russell, in the amount of $3,195, exactly 90 percent of the purported fee paid under the financial management contract. This check also bore the notation "gift." Petitioner Max Benningfield endorsed this check and deposited it into petitioners' joint checking account, where it was posted on December 31, 1979. See note 3.

Petitioner prepared his own 1980 and 1981 Federal income tax returns, electing married-filing-separate-return status.

During 1980, petitioner was employed as a steamfitter by several construction companies. Those companies paid petitioner wages in 1980 totaling $25,781.39. Of that total, petitioner endorsed paychecks over to PTS in the amount of $5,825.25, and deducted that amount on line 21 of his 1980 return as a "non-constructive receipt from line 8 per attached confirmation." This "attached confirmation" was a document from IDI, purporting to confirm its purchase of accounts receivable from PTS "on labor account delivered by; Max E. Benningfield, Jr.," upon which IDI purportedly "charged and received in full a discount of $5,825.25 from the gross value of the accounts receivables."

During 1981, petitioner was employed as a steamfitter by several construction companies. Those companies paid petitioner wages in 1981 totaling $44,311.50. Petitioner did not report his total wages of $44,311.50 on the line 7 ("Wages, salaries, tips, etc.") on his 1981 return. Instead, he reported on line 7 only the $18,793.67 representing paychecks he personally endorsed and cashed. The remaining $25,517.83, he endorsed over to PTS. PTS issued a certificate purportedly acknowledging "the receipt of $25,517.83 upon duly pledged and purchased life services in account with Max E. Benning-

---

[4]Petitioner's check number 800 was stamped "RETURNED NOT PAID— NSF" and was returned for insufficient funds on Jan. 3, 1980, and was subsequently redeposited and paid on Jan. 10, 1980.

field, Jr., during the calendar year 1981 and attest to full constructive receipt thereon."[5] That certificate was signed by Forrester.

On his Federal income tax returns for the years 1975–79, petitioner reported the following wages and income tax withholdings:

| Year | Wages | Income tax withholding |
|------|-------|------------------------|
| 1975 | $14,933.23 | $2,532.98 |
| 1976 | 8,400.39 | 1,536.29 |
| 1977 | 22,285.00 | 4,300.00 |
| 1978 | 27,945.00 | 5,670.00 |
| 1979 | 32,692.08 | 2,669.35 |
|      | 106,255.70 | 16,708.62 |

For 1980 and 1981, petitioner had wages and income tax withholdings as follows:

| Year | Wages | Income tax withholding |
|------|-------|------------------------|
| 1980 | $25,781.39 | $31.80 |
| 1981 | 44,311.50 | 0 |
|      | 70,092.89 | 31.80 |

Petitioner had little or no withholding from his 1980 and 1981 wages because, after signing the services contract, petitioner presented Forms W-4 to his employers claiming exemption from Federal income tax withholding.

Two statutory notices of deficiency were issued in this case. The first notice was addressed to petitioner and covered the taxable years 1975 and 1976, years when petitioner was single. The second was addressed to petitioners and covered the taxable years 1977, 1978, and 1979, years when they were married and filed jointly. Petitioners prepared their own joint return for 1979. On that return, they claimed on line 21 a deduction of $2,380.63 as a "factor discount on receivables sold," representing petitioner's two 1979 paychecks from J. A. Jones that he had endorsed over to PTS. On their Schedule A, Itemized Deductions, line 31, petitioners claimed a deduction of $3,550 for "financial counseling," representing the amount

---

[5]The record does not show the exact amount of the $5,825.25 for 1980 and of the $25,517.83 for 1981 that petitioner received back as "gifts," but those years are not before us, and are merely included to show the continuing pattern.

of their check number 800 issued to IDI. See note 4. Respondent disallowed these deductions.

OPINION

I

*Deduction for "Factor Discount on Accounts Receivable"*

This case presents yet another device by which a taxpayer seeks to avoid paying income taxes on his earnings. As petitioner sees it, he has indefinitely assigned or sold his future services as a steamfitter to Professional & Technical Services (PTS) in consideration of $1 annually and 27 "economic justifications." PTS then purported to resell the "accounts receivable" representing petitioner's earnings to "independent" parties, here International Dynamics, Inc. (IDI), which, at PTS' "request," contributed 90 percent or more of the "accounts" to "independent and unrelated tax-free, offshore private charities, foundations, or other non-profit organizations," here the IDI Credit Union, purportedly a Canadian charitable trust. Such "non-profit organization" (IDI Credit Union) allegedly had "sole discretion" to give away these amounts. Magically and beneficently, at or about the same time that he endorsed his paychecks to PTS, petitioner received back 90 percent or more of his paychecks from the "non-profit organization" as "gifts." On his tax return, petitioner then deducted or excluded from gross income the full amount of the paychecks endorsed to PTS, labeling such deduction as a "factor discount on accounts receivable." Petitioner would have us hold that PTS, not he, is taxable on his wages from J. A. Jones Construction Co. Petitioner would have us hold that he in effect is a "loaned employee," agent, and conduit for payment to PTS of what is "rightfully theirs." He appears to argue that the deduction he claimed for "factor discount on accounts receivable" is merely to offset the amount of income improperly reflected in his W-2 earnings from J. A. Jones Construction Co. We will not sanction this flagrant and abusive tax-avoidance scheme.

A fundamental principle of our tax system is that income must be taxed to the one who earns it. *Commissioner v. Culbertson,* 337 U.S. 733, 739–740 (1949). Even assuming their validity under State law, contractual arrangements designed

to circumvent this rule, by attempting to deflect income away from the one who earns it, will not be recognized for Federal income tax purposes. *United States v. Basye*, 410 U.S. 441, 449–450 (1973); *Lucas v. Earl*, 281 U.S. 111, 114–115 (1930). Determining who earns the income depends upon which person or entity in fact controls the earning of the income, not who ultimately receives the income. *Johnson v. Commissioner*, 78 T.C. 882, 891 (1982); *American Savings Bank v. Commissioner*, 56 T.C. 828, 839–842 (1971). See generally *Vercio v. Commissioner*, 73 T.C. 1246 (1980); *Wesenberg v. Commissioner*, 69 T.C. 1005 (1978).

Petitioner argues that he was merely an agent or employee of PTS and that he performed services for J. A. Jones Construction Co. merely as a "loaned employee"[6] of PTS, and therefore the income paid for the performance of his services is taxable to PTS. We disagree.

To find that PTS controlled the earning of the income requires two elements. First, PTS must have had the right to direct or control petitioner's activities in some meaningful manner. See *Johnson v. United States*, 698 F.2d 372, 374 (9th Cir. 1982); *Schulz v. Commissioner*, 686 F.2d 490, 494 (7th Cir. 1982), affg. a Memorandum Opinion of this Court; *Vnuk v. Commissioner*, 621 F.2d 1318, 1320–1321 (8th Cir. 1980), affg. a Memorandum Opinion of this Court; *Johnson v. Commissioner*, 78 T.C. at 891; *Vercio v. Commissioner*, 73 T.C. at 1254. Second, there must have been a contract or similar indicium of agreement between PTS and J. A. Jones Construction Co. recognizing PTS' controlling position. *Johnson v. United States, supra; Stephenson v. Commissioner*, 79 T.C. 995, 1001 (1982); *Johnson v. Commissioner, supra* at 891, 893. Neither element is present here.

Under the services contract, petitioner's only "obligation" to PTS was to continue to sell "indefinitely" his personal services to PTS and to forward his endorsed paychecks to PTS or its assignees. The services contract appears to leave in petitioner the right to negotiate labor union affiliations and fringe benefits on his own behalf. Nothing in the services contract

---

[6]See *Rubin v. Commissioner*, 429 F.2d 650 (2d Cir. 1970); *Laughton v. Commissioner*, 40 B.T.A. 101 (1939), remanded on other grounds 113 F.2d 103 (9th Cir. 1940); *Fox v. Commissioner*, 37 B.T.A. 271 (1938).

establishes any sort of employer-employee or principal-agent relationship between petitioner and PTS or otherwise gives PTS any right to control petitioner's activities as a steamfitter. The record is devoid of any evidence suggesting that PTS ever purported to exercise any such control over petitioner.

Nor is there any evidence of a contract or other indicium of agreement between PTS and J. A. Jones Construction Co. recognizing PTS as controlling petitioner's activities. In fact, petitioner admitted at the trial that J. A. Jones Construction Co. did not even know of his services contract with PTS. We also note that petitioner himself did not honor the terms of the personal services contract, yet he argues that respondent and this Court are bound by that agreement. Although he was purportedly obligated to continue to sell his services to PTS and to forward all "accounts receivable payments" (paychecks) to PTS or its assignees, in 1980, he did so with only 20 percent of his paychecks, and, in 1981, with only 60 percent.

Petitioner's argument that the contract clause of the U.S. Constitution[7] somehow requires respondent and this Court to give effect to his scheme is frivolous. The Contract Clause, by its terms, applies only to the States, not to the Federal Government. *New York v. United States*, 257 U.S. 591, 601 (1922); *Mitchell v. Clark*, 110 U.S. 633, 643 (1884); *Sinking-Fund Cases*, 99 U.S. 700, 718 (1878); *Legal Tender Cases*, 79 U.S. (12 Wall.) 457, 549-551 (1870). In any event, our holding in this case does not impair the obligation of petitioner's contractual arrangements with PTS. This Court, as the Supreme Court did in *Lucas v. Earl, supra,* assumes the validity of petitioner's contract under State law. The contract clause does not prohibit the United States from taxing a party or parties to a private contract. Notwithstanding the validity of the contract under State law, an anticipatory assignment of income such as this is not effective for Federal tax purposes.

Where, as here, the right to receive income is contingent upon the continued performance of services by an individual, the "Income is taxable to the person whose performance of services creates the right to receive the income." *United States*

---

[7]Art. I, sec. 10 of the Constitution provides in pertinent part, that no State may pass any law impairing the obligation of contracts. Petitioner makes no comparable argument as to the Federal Government under the Fifth Amendment, but that would be equally frivolous.

*v. Landsberger*, 692 F.2d 501, 503 (8th Cir. 1982), affg. on this issue 534 F. Supp. 142, 144 (D. Minn. 1982). See also *Daugherty v. Commissioner*, 63 F.2d 77. (9th Cir. 1933); *Bennett v. Commissioner*, 23 T.C. 1073 (1955). Accordingly, since PTS did not control the production of the income, petitioner's attempt to shift to PTS the tax incidence of the income he earned is ineffective, and petitioner remains taxable on his wages.[8]

## II

### *Deduction for Financial Counseling*

On their 1979 return, petitioners claimed a deduction in the amount of $3,550 for "financial counseling." Under his "Financial Management Contract" with IDI, the $3,550 was purportedly a retainer for "Financial Counselling, Estate Planning, and Tax Consequence Advice and Taxes Owed" services to be performed in 1980 by IDI. The record does not establish that IDI ever rendered such services. In any event, on the same day petitioner gave his check for $3,550 to IDI, and as part of the same transaction, he received back a check for $3,195 from IDI Credit Union.

Deductions are a matter of legislative grace, and a taxpayer must satisfy the specific statutory requirements for the deductions he claims. *Deputy v. du Pont*, 308 U.S. 488 (1940); *New Colonial Ice Co. v. Helvering*, 292 U.S. 435 (1934). Petitioner has not articulated any particular theory upon which he claims this deduction. There is no evidence to show that this alleged payment in any way relates to a trade or business of the taxpayer. Sec. 162. Nor is there any evidence that this alleged payment relates to the production or collection of income. Sec. 212(1) and (2). Therefore, we assume petitioner relies upon section 212(3).

Section 212(3) permits a deduction for all the ordinary and necessary expenses "paid or incurred during the taxable year

---

[8]We note that another court has determined that this same tax-avoidance device is a mere sham. See *United States v. Landsberger*, 534 F. Supp. 142, 145 (D. Minn. 1982), affd. on this issue 692 F.2d 501 (8th Cir. 1982). We also note that we have reached the same conclusion with respect to similar tax-avoidance gimmicks. See *Zmuda v. Commissioner*, 79 T.C. 714, 719–722 (1982); *Markosian v. Commissioner*, 73 T.C. 1235 (1980). We have also rejected this same tax-avoidance plan in a Memorandum Opinion of this Court. See *Page v. Commissioner*, T.C. Memo. 1983–515.

in connection with the determination, collection, or refund of any tax." Petitioner must prove that the claimed expense was both "ordinary and necessary" and in fact expended for the statutory purpose. *Professional Services v. Commissioner*, 79 T.C. 888, 917–920 (1982); Rule 142(a).

First, it is clear that petitioner has actually expended no more than $355. Petitioner issued a check for $3,550 and simultaneously received back one for $3,195. In no way can petitioner's receipt of the second check be viewed separate and apart from his issuance of the first. The check for $3,550, to the extent offset by the check for $3,195, does not constitute "payment" under either section 162 or section 212. See *Pike v. Commissioner*, 78 T.C. 822, 849 (1982), on appeal (9th Cir., Sept. 20, 1982).[9] See also *Menz v. Commissioner*, 80 T.C. 1174 (1983), discussing the analogous circumstance of payment with borrowed funds, and *Manocchio v. Commissioner*, 710 F.2d 1400 (9th Cir. 1983), affg. 78 T.C. 989 (1982), where the Ninth Circuit ruled that there can be no deduction for a reimbursed expense.

The financial management contract recites that IDI was obligated to perform certain "services" but that does not prove that petitioner received any such services. Nor do the labels attached by the parties to the agreement prove that such "expenses," even the $355 actually expended, are for tax and estate planning and representation deductible under section 212(3). Petitioner has completely failed to prove he expended any funds for a deductible purpose. See generally *Professional Services v. Commissioner*, 79 T.C. at 917–920; *Luman v. Commissioner*, 79 T.C. 846, 855–860 (1982); *Zmuda v. Commissioner*, 79 T.C. at 724–725; *Epp v. Commissioner*, 78 T.C. 801, 803–807 (1982); *Contini v. Commissioner*, 76 T.C. 447, 453–455 (1981).

## III

### *Section 6653(a) Negligence Addition*

Where any part of an underpayment is due to negligence or intentional disregard of rules and regulations, section 6653(a)

---

[9] See also *Thoburn v. Commissioner*, T.C. Memo. 1983–486.

imposes an addition to tax in an amount equal to 5 percent of the underpayment. Both petitioners bear the burden of disproving respondent's determination that the negligence addition applies to them. Rule 142(a); *Luman v. Commissioner*, 79 T.C. at 860–861; *Bixby v. Commissioner*, 58 T.C. 757, 791–792 (1972).

Despite having had their "complex" 1977 and 1978 Federal income tax returns prepared by an accountant, petitioners themselves prepared their equally "complex" 1979 return. Petitioners did not seek or receive any legal advice about the tax consequences of their plan to avoid income taxes. This plan included a flagrant attempt to assign wage income earned by petitioner Max Benningfield and claimed deductions in an amount 10 times as great as their actual expenditures. Petitioner Max Benningfield testified in conclusory terms that he regarded the checks he received back from the IDI Credit Union as "gifts." The Court found his testimony wholly unworthy of belief and concludes that no reasonable person could believe such a "pie-in-the-sky" scheme.

We, and other courts, have repeatedly sustained the negligence addition in cases involving similar tax-avoidance schemes. See *Vnuk v. Commissioner*, 621 F.2d at 1321; *Luman v. Commissioner*, 79 T.C. at 860–861; *Zmuda v. Commissioner*, 79 T.C. at 729; *Vercio v. Commissioner*, 73 T.C. at 1259; *Wesenberg v. Commissioner*, 69 T.C. at 1015. See also *Schulz v. Commissioner*, 686 F.2d at 497. We find the section 6653(a) negligence addition wholly justified in this case.[10] "No reasonable person would have trusted this scheme to work." *Hanson v. Commissioner*, 696 F.2d 1232, 1234 (9th Cir. 1983), affg. a Memorandum Opinion of this Court.

*Decision will be entered under Rule 155.*

---

[10]Recently, we have also sustained the sec. 6653(b) fraud addition in cases involving similarly abusive tax-avoidance schemes. See *Stephenson v. Commissioner*, 79 T.C. 995, 1005–1008 (1982); *Professional Services v. Commissioner*, 79 T.C. 888, 929–933 (1982). In this case, we have also considered imposing damages under sec. 6673 on our own motion. While we have not done so, we think it worth noting this Court's most recent statement on imposition of sec. 6673 damages in another case involving another brazen tax-avoidance scheme. See *Miedaner v. Commissioner*, 81 T.C. 272 (1983).