GEORGE J. KITCHER AND BARBARA E. KITCHER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Kitcher v. Commissioner
Docket No. 24321-82.
United States Tax Court
T.C. Memo 1986-41; 1986 Tax Ct. Memo LEXIS 567; 51 T.C.M. (CCH) 372; T.C.M. (RIA) 86041; January 29, 1986
Thomas P. Cullen, Jr., for the petitioners. William S. Garofalo and Richard J. Sapinski, for the respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent determined deficiencies in petitioners' 1980 Federal income taxes and section 6653(a) [1] additions to tax as follows: Sec. 6653(a)
Petitioner
Deficiency
Addition to Tax
George J. Kitcher
$9,329.24
$466.46
Barbara E. Kitcher
5,517.03
275.85
After concessions, [2] the issues for decision are (1) whether petitioners are precluded from claiming joint filing status for the taxable year in issue, and (2) whether the payment in the amount of $5,100 that petitioners *572 made to become ministers in the Freedom Church of Revelation was expended for tax advice or for legal representation and deductible under section 212(3). FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioners, George J. Kitcher (Mr. Kitcher) and Barbara *573 E. Kitcher (Mrs. Kitcher), husband and wife, resided in Flushing, New York, at the time their petition was filed in this case. Each petitioner timely filed an individual 1980 Federal income tax return (Form 1040) with the Internal Revenue Service Center in Holtsville, New York. Petitioners were husband and wife at the close of the 1980 taxable year and could have filed a joint return for such year, but instead they filed separate returns with each claiming the filing status of "married filing separately." Petitioners did not file any amended return claiming joint filing status for 1980 at any time before the filing of the petition in this case. Mr. Kitcher is employed with the New York Telephone Company as a telephone technician, having been employed with this company for some 19-1/2 years. His annual salary was approximately $30,000. Mr. Kitcher neither presently owns nor has ever owned his own home. Mr. Kitcher is presently married to Barbara E. Kitcher, the co-petitioner in this case. During the year involved in this case, he had one child from a previous marriage. At all times relevant to this case, Mrs. Kitcher was employed with the New York Telephone Company as a customer *574 service representative, having been employed with the company for about 15 years. Her annual salary at the time she left that employment was approximately $20,000. Petitioners George and Barbara Kitcher were married on July 26, 1980. At some point during 1980, petitioners obtained credentials as ministers in the Freedom Church of Revelation (hereinafter FCR). When Mr. Kitcher was first introduced to the FCR, he was experiencing financial problems. He was then recently divorced, paying alimony to his former wife, and searching for a means to save money and to get ahead. During this period, Mr. Kitcher met a minister from the FCR who invited him to attend an FCR seminar. Such recruiters were paid commissions by the FCR for each new member. In the course of his recruitment, Mr. Kitcher was shown copies of tax returns that other ministers in the FCR had filed in previous years, together with copies of refund checks that had been issued by the Internal Revenue Service in connection with those returns. Petitioners attended an FCR meeting that was held at a hotel at LaGuardia Airport. They were told at this meeting that becoming a minister in the FCR was a legal way to avoid *575 Federal and state taxes. Petitioners' purpose in becoming ministers in the FCR was to become legally tax exempt. The record does not indicate that any professional person, knowledgeable in the tax law and competent and qualified to render tax opinions, was present at petitioners' initial meeting or at any subsequent meetings or that such a qualified professional person ever represented to petitioners that these purported tax benefits were valid. Any representations to petitioners were made by other FCR ministers. Prior to joining the FCR, petitioners did not seek the legal advice or opinion of any outside accountant of attorney concerning the correctness of the FCR's representations that becoming a minister in the FCR was a legal means to avoid taxes. The FCR membership procedures required prospective members to make an initial "donation" or payment to the FCR to become a minister. The initial cost to petitioners to become ministers in the FCR and to acquire this purported tax-exempt status was $5,100. Petitioners considered the $5,100 to be a good investment and a good bargain if they never had to pay any more taxes. Petitioners made their "donation" to the FCR by a check *576 dated June 20, 1980, in the amount of $5,100. The stated purpose of this $5,100 payment is indicated by a handwritten notation on the bottom right-hand corner of the check that reads: "Donation-Educationa." Petitioners do not know and the record does not show how the FCR used the $5,100 payment made by petitioners. However, Mr. Kitcher was told that a portion of the $5,100 membership fee would be used to build a holistic health center, a portion to fund the FCR's legal department, and the remaining portion would be used to acquire various publications and to recruit new members. Some part of petitioners' payment was probably paid as a commission to the FCR minister who recruited them. In return for the payment of $5,100, petitioners received their FCR minister credentials and their certificates of sacramental authority from the FCR that purportedly would enable them to perform marriages, baptisms, and other sacraments. [3] Petitioners also received an FCR charter designating them as a chapter or local church of the FCR. Petitioners used their ministerial credentials to receive fringe benefits such as discounts in furniture and clothing stores and exemption from local sales taxes. *577 In addition, as ministers in the FCR, petitioners were entitled to and did receive a commission for bringing a new member into the FCR. Petitioners received this commission in a year subsequent to that before the Court. Petitioners also received various government publications as a part of the package they *578 were given upon becoming ministers in the FCR. Petitioners received Publication 517, relating to social security for clergy members, and were told that this publication would allow them as FCR ministers to withdraw from social security. Petitioners received Publication 526 relating to charitable contributions and were told that any charitable contributions they made to the FCR would qualify as a charitable deduction pursuant to this publication. [4] Petitioners also received a copy of the determination letter dated June 8, 1979, issued by the Internal Revenue Service, that stated that the FCR of Hohokus, New Jersey was exempt from Federal income tax under section 501(c)(3). [5]
*579 Petitioners also received a photocopy of a 1979 tax return that was filed by Rev. Leonard Scarnato, Jr., a minister in the FCR. On the back of this return was photocopied a United States Treasury check dated May 30, 1980, made payable to "LEONARD JR SCARNATO" in the amount of $6,990.12, which was the exact amount claimed on the return as a refund. The amount claimed as a refund consisted of Federal income tax withheld in the amount of $5,638.40 and excess FICA and RRTA tax withheld in the amount of $1,351.72. Mr. Scarnato filed this return purportedly as an agent and minister of the FCR, claiming he was under a vow of poverty and therefore was exempt from taxation pursuant to section 3401(a)(9). The return showed adjusted gross income in the amount of $23,191.20, taxable income for the same amount, and $0 tax due. Petitioners were instructed by the FCR to use this tax return as a model and to file their tax returns in exactly the same manner. [6]
*580 The FCR held numerous meetings from time to time and required the ministers to attend at least three meetings each year. Generally, these meetings were held in conference rooms at various hotels. Each meeting usually began with a prayer and the Pledge of Allegiance. Occasionally, someone would read some articles or briefly list donations that the FCR had made to various charities. The stated purpose of these meetings was to further the ministers' education and philosophy in the FCR together with thme tenets of their religion. Petitioners attended several of these meetings. Only 10 percent of each meeting was devoted to what could be called religious instruction. The main purpose of these meetings was to review the latest information and documents relating to the operation of each minister's church, including the proper procedure to maintain their taxexempt status. The meetings included instruction on the preparation of income tax forms, instruction on how to file for exemption from social security and from the employer's withholding provisions, and also the proper procedure in filing state sales tax exemption forms. These meetings generally included lectures from Joseph *581 Coniglione, the bishop in the FCR, and were usually concluded with a question and answer period. The lectures included nutrition, diet, and holistic health matters. Occasionally, questions were directed to William DeMarco, who was legal counsel for the FCR, questions involving the authority of the state to incarcerate members for failing to produce documents or membership lists. The record, however, indicates that Mr. DeMarco was not legal counsel for the FCR at the time petitioners initially became members. William DeMarco is a practicing attorney, licensed in the State of New Jersey. He has a generaly practice and handles both criminal and civil matters. About 60 percent of his practice consists of criminal defense work, and the remainder consists of general litigation that includes matrimonial matters. Mr. DeMarco does not have any post-graduate education in the area of taxation. He has never written any articles in the tax field, and he does not hold himself out to the public as a tax expert. Mr. DeMarco first became involved with the FCR and Joseph Coniglione about the middle or the latter part of 1980. At that time, a board member of the FCR was in jail on contempt *582 charges stemming from state grand jury proceedings. Mr. DeMarco was retained by the FCR to effect the release of the incarcerated board member. Thereafter, Mr. DeMarco began representing Joseph Coniglione and the FCR on an irregular basis in various matters, but eventually Mr. DeMarco became involved on a more regular basis. About the middle of 1981, Mr. DeMarco became involved with the FCR on a regular basis. Mr. DeMarco handled various non-tax legal matters for Mr. Coniglione and the FCR. Mr. Coniglione was under a criminal investigation by the State of New Jersey. There were First Amendment problems concerning the literature published by the FCR, particularly in regard to holistic healing. There were problems concerning the general treatment that the FCR received from various government agencies, again related to holistic healing. At this time, Mr. DeMarco was retained as general counsel by the FCR to handle these various matters and to defend the deductibility of donations to the FCR. However, Mr. DeMarco did not personally handle these tax matters for the FCR. At first he hired Harvey Zeller to handle the FCR's tax work on a per diem basis and later hired Steve Gelb *583 to handle its tax work on a regular basis. [7] During the period of his involvement, Mr. DeMarco occasionally attended the meetings held by the FCR. At first he was introduced at these meetings as the attorney for Jerry Heineman, the board member who had been incarcerated. Later, he was introduced as general counsel of the FCR. Harvey Zeller and Steve Gelb were also mentioned occasionally at the FCR meetings as lawyers representing the church. At these meetings, Mr. DeMarco was available to answer questions from the ministers. These questions included issues concerning the First Amendment, questions concerning the incarceration of their fellow church member, Jerry Heineman, and practical procedural questions from ministers who were currently going through an audit with the Internal Revenue Service. However, Mr. DeMarco always referred the ministers with tax questions to Steve Gelb. The record does not indicate that Mr. DeMarco answered specific questions from petitioners at these meetings or that he ever personally referred petitioners to Steve Gelb. Petitioners never heard Mr. DeMarco speak at any of the meetings that they attended. *584 Mr. DeMarco's firm became involved with the individual FCR ministers' tax problems only after the tax returns were filed and audited by the Internal Revenue Service. Generally, the ministers were instructed to contact Mr. DeMarco's office regarding any problems they encountered with the Internal Revenue Service that related to the deductibility of donations made to the FCR. In the normal case, the ministers would forward to Mr. DeMarco's office the notice of deficiency that they received from the Internal Revenue Service, and Mr. DeMarco's office would file a petition with the Tax Court contesting the deficiency. Mr. DeMarco did not bill the ministers individually for this service but received an overall retainer each month from the FCR for all the work he and his firm had done, including non-tax matters. As general counsel, Mr. DeMarco received approximately $4,000 to $5,000 each month in legal fees from the FCR. He computed these amounts on an hourly rate based on the time that he personally expensed and the cost of having an associate devoting most of his time to the FCR, including any expenses that were incurred. As general counsel for the FCR, Mr. DeMarco neither rendered *585 opinions to church members regarding the deductibility of the amounts paid to the FCR nor advised church members regarding the preparation of their income tax returns. Moreover, he did not give instructions on the preparation of tax returns during any of the meetings that he attended. Mr. DeMarco's firm reviewed tax returns for the ministers only in the event of an audit. In addition, he never rendered opinions to prospective church members regarding the alleged tax benefits of becoming a minister in the FCR. Mr. DeMarco never met or spoke with petitioners. Moreover, Mr. DeMarco never reviewed any documents relating to the FCR for Mr. Coniglione regarding their legality. The FCR had been in operation for some time before Mr. DeMarco ever became associated with it in any capacity. Occasionally, ministers under audit would come to Mr. DeMarco's office and, in the course of conversation, espouse clear misstatements of the law that some other minister in the FCR had told them. Steve Gelb would then send a memo to the minister(s) responsible for this misinformation and advise them that the advice they were giving was wrong. In addition, in response to the many repetitive procedural *586 questions from ministers who were then under audit, Steve Gelb prepared a form letter for Mr. DeMarco's signature that described the procedural steps that occur from the beginning of an audit of a tax return to the filing of a petition with the Tax Court. The record is unclear as to whether a copy of this letter was sent to every FCR minister or just to those ministers who were under an audit by the Internal Revenue Service. In any event, petitioners received a copy of this letter, dated November 11, 1981, and signed by Mr. DeMarco. The letter was addressed to Mr. and Mrs. George Kitcher and was typed on Mr. DeMarco's stationery. In addition to the procedural concerns, the letter also stated that any questions that arise should be directed in writing to Mr. DeMarco's office. In addition, the letter encouraged petitioners to execute a power of attorney to permit Mr. DeMarco's firm to receive all future communications directly from the Internal Revenue Service on their behalf. The record does not indicate whether petitioners executed such a power of attorney. [8]
*587 Except for wrapping up some loose ends, Mr. DeMarco ceased representing the FCR on a regular basis in December of 1982. Within this same time frame, Steve Gelb left the employ of Mr. DeMarco, and an attorney named Kosarek replaced him. However, shortly thereafter, the FCR organized its own legal department, and Kosarek left Mr. DeMarco and became a member of the FCR's legal department. About this time, an attorney named James V. Tamburro also began working for the FCR's legal department. [9] The FCR's Legal Department and Mr. DeMarco's office were located on different floors in the same building, but were wholly separate and independent of one another. *588 Petitioners filed their 1980 Federal income tax returns in accordance with the instructions provided by the FCR. On his 1980 Federal income tax return, Mr. Kitcher reported adjusted gross income in the amount of $30,959.68, his W-2 wages from the New York Telephone Company, but listed his occupation as "agent for church." On the Schedule A attached to his Form 1040, Mr. Kitcher reported charitable contributions in the amount of $31,000.07. These claimed charitable contributions, less the zero bracket amount, reduced his reported taxable income to an amount of $1,659.61. That effectively reduced his tax liability to zero and consequently, he claimed a total refund of the Federal income tax that had been withheld in the amount of $5,540.43.Attached to his 1980 tax return was a vow of poverty signed by Mr. Kitcher on December 17, 1980. On her 1980 Federal income tax return, Mrs. Kitcher reported adjusted gross income in the amount of $21,939.61, her W-2 wages from the New York Telephone Company, but listed her occupation as "agent for church." On the Schedule A attached to her Form 1040, Mrs. Kitcher reported charitable contributions in the amount of $25,518. These claimed charitable *589 contributions, with or without the zero bracket amount, reduced her tax liability to zero, and consequently she claimed a total refund of the Federal income tax that had been withheld in the amount of $2,041.13. Attached to her 1980 tax return was a vow of poverty signed by Mrs. Kitcher on December 27, 1980. Attached to the returns of both spouses were receipts of purported cash contributions to the FCR, in each instance totalling at least the amount of each spouse's total W-2 wage income. Neither Mr. Kitcher nor Mrs. Kitcher claimed the initial $5,100 payment to the FCR as a deduction in determining each spouse's 1980 tax liability. Moreover, petitioners never filed an amended return claiming the $5,100 deduction. By a statutory notice of deficiency dated July 7, 1982, respondent determined that the amount of $31,000 claimed by Mr. Kitcher on his 1980 Federal income tax return as a charitable contribution deduction did not qualify as a charitable contribution under the Internal Revenue Code. By a statutory notice of deficiency dated July 7, 1982, respondent determined the amount of $25,518 claimed by Mrs. Kitcher on her 1980 Federal income tax return as a charitable contribution *590 deduction did not qualify as a charitable contribution under the Internal Revenue Code. In determining Mr. Kitcher's tax liability, respondent allowed him the standard deduction or zero bracket amount, and also allowed him two $1,000 exemptions, a personal exemption for himself and a dependency exemption for his son.In determining Mrs. Kitcher's tax liability, respondent allowed her the standard deduction or zero bracket amount, and also allowed her a $1,000 personal exemption. The deficiency for each spouse was computed using rates for a married person filing separately. Petitioners forwarded all the correspondence that they received from the Internal Revenue Service, including the notices of deficiency, to Mr. DeMarco's office. In response to these statutory notices, Steve Gelb, while working for Mr. DeMarco, timely filed a petition on October 4, 1982, with the Tax Court on petitioners' behalf. The petition challenged respondent's disallowance of the charitable contribution deductions and the additions to tax for negligence. Mr. DeMarco did not bill petitioners in connection with filing the Tax Court petition but was purportedly paid by the FCR. Except for filing the petition *591 and a request for place of trial, neither Mr. DeMarco and Steve Gelb nor any other attorney for the FCR made any other appearances on record or took any other action in this proceeding on petitioners' behalf. Petitioners were represented at the trial by their present attorney whom they had retained for that purpose. At some point after the filing of the petition and prior to trial, petitioners for the first time raised the issues for decision in this case. By stipulation, petitioners conceded the correctness of respondent's disallowance of the charitable contributions deductions and also conceded that the negligence addition under section 6653(a) is applicable to any deficiency. [10] Respondent conceded that the new issues were raised in the Tax Court sufficiently early and those issues were thus tried by agreement of the parties. *592 OPINION 1. Joint Filing Status
Petitioners filed separate Federal income tax returns (Forms 1040) for the 1980 taxable year and claimed "married filing separately" as their filing status. Petitioners were husband and wife at the close of the 1980 taxable year and could have filed a joint return for that year under section 6013(a) had they timely elected to do so. Each petitioner received a statutory notice of deficiency dated July 7, 1982, for the 1980 taxable year. In response to these statutory notices, a petition was timely filed on October 4, 1982, with the Tax Court on petitioners' behalf. Having chosen initially to file separate returns, as petitioners did here, taxpayers have the privilege to switch to joint filing status. Section 6013(b)(1) provides in pertinent part that: Except as provided in paragraph (2), if an individual has filed a separate return for a taxable year for which a joint return could have been made by him and his spouse under subsection (a) and the time prescribed by law for filing the return for such taxable year has expired, such individual and *593 his spouse may nevertheless make a joint return for such taxable year.* * * However, this switching privilege is sharply limited by section 6013(b)(2). As pertinent to this case, section 6013(b)(2) provides that: The election provided for in paragraph (1) may not be made-- * * * (C) after there has been mailed to either spouse, with respect to such taxable year, a notice of deficiency under section 6212, if the spouse, as to such notice, files a petition with the Tax Court within the time prescribed in section 6213. Petitioners never elected joint filing status at anytime prior to the mailing of the statutory notice of deficiency or prior to the filing of their petition in this Court. Thus section 6013(b)(2)(C) clearly precludes petitioners from electing joint filing status at this time. Petitioners contend, however, that neither Mr. DeMarco nor Mr. Gelb advised them that filing a petition in the Tax Court would preclude the election of joint filing status. Assuming that to be the case, this Court cannot ignore or change the terms of the statute. Petitioners argue on brief that Mr. DeMarco was not counsel "of their own choosing, and his advice was apparently not *594 upon the particular circumstances of the petitioners (Tr. 76, 77) but rather on the circumstances of what was best for the church." Petitioners have not established the factual predicate for their argument. [11]Having sought the benefits of this prepayment forum (the Tax Court), petitioners must accept any legal burdens or limitations incident to that choice. [12]
*595 Petitioners nonetheless urge us in the interest of justice not to further penalize them for "the improper advice" of their former counsel [13] but to allow them to elect joint filing status for the 1980 taxable year. Petitioners are not so much asking for equitable [14] relief as they are asking us to disregard or ignore the clear mandate of the statute. This we cannot do. *596 The clear, unambiguous statutory language of section 6013(b)(2)(C) precludes the election of joint filing status after a notice of deficiency has been mailed to either spouse if a petition, in response to such notice, is timely filed with the Tax Court. Thompson v. Commissioner,78 T.C. 558, 561 (1982); Richardson v. Commissioner,72 T.C. 818, 826 (1979). Even if petitioners had tried to elect joint filing status between the date of the mailing of the statutory notice and the filing of the petition, it would have been too late. Under section 6013(b)(2)(C), the timely filing of a petition with the Tax Court annuls any election of joint filing status, by formal amended return or otherwise, made after the date on which the notice of deficiency was mailed. Druker v. Commissioner,697 F.2d 46, 52 (2d Cir. 1982), affg. on this point 77 T.C. 867 (1981), cert. denied 461 U.S. 957 (1983); Jacobson v. Commissioner,73 T.C. 610, 614 (1979). Since petitioners did not elect joint filing status prior *597 to July 7, 1982, the filing of the petition with the Tax Court on October 4, 1982, precludes petitioners from electing joint filing status for the 1980 taxable year at this time. Section 212(3) Deductions
Petitioners contend that at least fifty percent of the $5,100 they paid to the Freedom Church of Revelation (FCR) is properly deductible in 1980 under section 212(3) as an amount expended for tax advice and legal representation in contesting their tax liability. [15] Respondent argues that such amounts are not ordinary and necessary expenses and do not bear a reasonable or proximate relation to the determination of petitioners' tax liability and consequently, are not deductible under section 212(3). Respondent argues in the alternative that any portion of the $5,100 membership fee allocated for tax advice or legal representation in the Tax Court is attributed to services to be performed in the future and thus a capital expenditure that must be capitalized and therefore is not properly deductible in 1980. Moreover, respondent argues that even assuming some part of the $5,100 membership payment was expended for tax advice or legal representation, petitioners have failed to *598 establish any reasonable basis for allocating any part of the $5,100 to these deductible items, and therefore, any deduction under section 212(3) must be denied. Section 212(3) allows a deduction for all the ordinary and necessary expenses "paid or incurred during the taxable year in connection with the determination, collection, or refund of any tax." [16] The regulations promulgated under this section provide in pertinent part that "expenses paid or incurred by a taxpayer for tax counsel or expenses paid or incurred in connection *599 with the preparation of his tax returns or in connection with any proceedings involved in determining the extent of tax liability or in contesting his tax liability are deductible." Section 1.212-1(1), Income Tax Regs. Moreover, ordinary and necessary expenses paid for Federal income tax planning are generally deductible under section 212(3). Zmuda v. Commissioner,79 T.C. 714, 725 (1982), affd. 731 F.2d 1417 (9th Cir. 1984); Merians v. Commissioner,60 T.C. 187 (1973); Collins v. Commissioner,54 T.C. 1656 (1970). Petitioners contend that in return for the required $5,100 membership fee which they paid to the FCR incident to becoming ministers therein, the FCR promised to provide them with tax advice and with legal representation in the event *600 the Internal Revenue Service ever questioned the deductibility of their charitable contributions to the FCR. Petitioners conclude the amounts expended for these services are deductible under section 212(3). However, petitioners must prove that any payment was "ordinary and necessary" and expended for the purposes designated in section 212(3). Professional Services v. Commissioner,79 T.C. 888, 919 (1982); Rule 142(a). We are not convinced the expense of $5,100 that petitioners incurred incident to becoming ministers in the FCR was in fact expended for any of the statutory purposes under section 212(3) or the regulations thereunder. Except for the uncorroborated, self-serving testimony of both petitioners, which we are not required to accept, Epp v. Commissioner,78 T.C. 801, 803 (1982), the record is singularly devoid of evidence as to any tax advice or legal representation that petitioners were entitled to receive or did receive in return for their $5,100 payment to the FCR. Petitioners offered no credible evidence to establish that the FCR was obligated *601 to provide them with any tax advice or legal representation in return for their $5,100 payment. [17] Accordingly, we conclude that petitioners paid $5,100 to the FCR to become ministers therein, and they have completely failed to prove they expended any funds for a deductible purpose under section 212(3). [18]
*602 Even assuming that the FCR was obligated to provide tax advice and legal representation in return for their $5,100 payment, petitioners would still bear the burden of proving that such services were actually rendered and these services were deductible items under section 212(3). Benningfield v. Commissioner,81 T.C. 408, 422 (1983). Petitioners admit that they became ministers in the FCR for the purpose of eliminating their tax liability. Petitioners claim they attended an FCR meeting prior to joining the FCR and were told that becoming a minister in the FCR was a legal means to avoid all Federal and state taxes. In addition, upon joining the FCR, they were given a packet of materials that contained various Internal Revenue Service publications relating to the tax-exempt status of churches and clergy members in general.They also received a copy of the determination letter dated June 8, 1979, issued by the Internal Revenue Service, that stated the FCR of Hohokus, New Jersey was exempt from Federal income tax under section 501(c)(3). Petitioners also received copies of tax returns that ministers in the FCR had filed in previous years. The returns indicated that *603 these ministers were tax-exempt and were entitled to a refund of previously withheld Federal income taxes. Petitioners argue that these documents reinforced and fostered their belief that they had indeed stumbled upon a legal means to avoid taxes. These facts might be relevant to a negligence issue, were this not such a "pie-in-the-sky" scheme. These facts, do not establish that petitioners had paid for or received tax advice and legal representation. However, petitioners argue that as ministers in the FCR, they attended various meetings where they received instructions in preparing the various tax forms they were required to file and other tax forms they were entitled to file as ministers in the FCR. Furthermore, petitioners also claim they received continuing instruction from the FCR on the organizational and operational aspects of their local chapter of the FCR in order to maintain their tax-exempt status. Petitioners contend the totality of these services represent deductible items under section 212(3).We think that it is significant that petitioners did not seek the advice of outside counsel prior to becoming ministers in the FCR. We conclude that the tax advice, which *604 petitioners claim enticed them to become ministers in the FCR, consisted merely of unwarranted representations by other ministers in the FCR. The record does not indicate that any professional person, knowledgeable in the area of tax and competent and qualified to render tax opinions, represented to petitioners the validity of the purported scheme to avoid all taxes. Such advice and opinions came only from other FCR ministers. [19] In effect, the FCR or agents thereof merely promised petitioners a permanent tax avoidance plan in return for their initial investment of $5,100, and no reasonable person could have believed such a "pie-in-the-sky" scheme. Not to put too fine a point on the matter, what petitioners though they were buying was freedom from all taxes, Federal and state, for the rest of their lives. Petitioners candidly testified that they thought the $5,100 was a good investment if they never had to pay any more taxes. Petitioners now acknowledge that this "pie-in-the-sky" scheme won't work, but they shamelessly ask the rest of the taxpaying public to share the expense of their failed tax avoidance scheme by trying to label the expense as a payment for tax advice and legal *605 representation. *606 We have repeatedly sustained the section 6653(a) additions against taxpayers for negligence or intentional disregard of rules and regulations in cases involving purported charitable contributions to a "church" that simply constituted use of the funds for personal and family expenses. Davis v. Comminssioner,81 T.C. 806, 821 n. 12 (1983), affd. by unpublished opinion 767 F.2d 931 (9th Cir. 1985).In addition, in Miedaner v. Commissioner,81 T.C. 272, 282 (1983), although we did not award damages, we made it crystal clear that claims with respect to churches established solely for tax avoidance purposes are frivolous, and serious consideration will be given in the future to imposing damages against taxpayers under section 6673. It would indeed be anomalous to allow a deduction under section 212(3) for amounts expended for any advice rendered by the FCR or representatives thereof that is totally unfounded and that espouses a position that we have repeatedly found to be both negligent and legally frivolous. [20] We conclude that petitioners *607 have failed to prove that the services they purportedly received in the preparation of their tax returns are within the scope of section 212(3) or the regulations thereunder. Finally, petitioners contend that at least the preparation and the filing of the petition in this case are deductible items under section 212(3). Petitioners sent the statutory notices of deficiency that they received from the Internal Revenue Service to Mr. DeMarco's office. Mr. DeMarco's office prepared and filed the petition in this case with the Tax Court on October 4, 1982.Mr. DeMarco did not bill petitioners *608 for this service but was paid by the FCR. The fee for filing this petition with the Tax Court was $60. Sec. 7451. [21] In addition, petitioners received a letter from Mr. DeMarco, dated November 11, 1981, that described the procedural steps that occur from the time of an audit to the filing of the petition with the Tax Court. Petitioners cite no authority that would allow a deduction in 1980 for amounts paid in such year for contingent legal services that might be performed in future years. Respondent argues that to the extent that a portion of the ministry fee paid in 1980 was for tax advice or legal representation in future years, such amounts must be capitalized and are not deductible in 1980. [22]Wildman v. Commissioner,78 T.C. 943, 957-962 (1982); Estate of Boyd v. Commissioner,76 T.C. 646, 664-668 (1981). We agree with respondent. Consequently, even if a portion of the $5,100 payment to the FCR could be deemed to be allocable to services performed after the year in issue, we conclude that such amount would not be properly deductible in 1980. *609 In any event, even if part of the $5,100 to the FCR could be deemed to have been made for tax advice and legal representation within the scope of section 212(3), the record is devoid of any rational basis on which we could allocate any portion of the payment to such purposes. Cf. Merians v. Commissioner,60 T.C. 187 (1973). Petitioners have the burden of proving what portion, if any, of such payment was paid for deductible items. Rule 142(a); Welch v. Helverong,290 U.S. 111 (1933). When a taxpayer proves that some part of an expenditure was made for deductible purposes and when the record contains sufficient evidence for us to make a reasonable allocation, we will do so. Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930). However, the record in this case provides absolutely no basis for making such an allocation. Under such circumstances, a deduction based on the Cohan rule would be "unguided largesse." Williams v. United States,245 F.2d 559, 560 (5th Cir. 1957); see Gran v. Commissioner,664 F.2d 199 (8th Cir. 1981), *610 affg. per curiam a Memorandum Opinion of this Court. Accordingly, we hold that petitioners are not entitled to any deduction under section 212(3) in connection with the $5,100 payment to the FCR. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable year in questioin, and all "Rule" references are to the Tax Court Rules of Practice and Procedure.↩
2. On the Schedule A attached to each petitioner's 1980 Federal income tax return, the only item claimed as an itemized deduction on either return was charitable contributions. Petitioners have now conceded that respondent properly disallowed the amounts claimed as charitable contributions on their 1980 tax returns, and both have conceded that the negligence addition under section 6653(a) is applicable to any deficiency. The parties also have now stipulated that: 1. Petitioner George Kitcher is entitled to deductions of $3,433 for taxable year 1980. 2. Petitioner Barbara Kitcher is entitled to deductions of $2,799 for taxable year 1980. 3. The deductions are itemized deductions and will only reduce taxable income to the extent thet exceed the zero bracket amount, pursuant to section 63(d).↩
3. Mr. Kitcher was told that New York required a registration procedure before ministers could perform marriages and baptisms. Mr. Kithcer never bothered to register. The record does not indicate whether Mrs. Kitcher ever registered or ever purported to perform any marriages. The Court makes no finding as to whether or not any FCR minister is legally authorized to perform a valid marriage in New York or elsewhere. Petitioners argue on brief that such marriages, including their own which they say was performed by an FCR minister on a sailboat in New York bay, are valid. There is no probative evidence in the record as to the facts of petitioners' marraige. Respondent, relying upon the rates for married persons filing separately, has raised no issue as to petitioners' marital status.The Court will assume for purposes of this case that petitioners' marriage is valid.↩
4. Petitioners also received Publication 525 (relating to taxable and nontaxable income); Circular E and Supplement Reprint (Employer's Tax Guide); an application for Exemption from Self-Employment Tax (Form 4361); and a copy of a page from the Supplement to Publication 78 that listed the FCR of Hohokus, New Jersey, as qualified to receive charitable contributions. We note that these various government publications are furnished by the Internal Revenue Service free of charge. ↩
5. The tax-exempt status of the parent FCR was retroactively revoked effective for all tax years beginning with the year ended December 31, 1978, by a letter dated September 30, 1982, from the Acting Associate Chief of the Internal Revenue Appeals office, Mid-Atlantic Region. The parent FCR challenged this revocation in the District Court of the District of Columbia pursuant to section 7428(c). The District Court sustained the Commissioner's retroactive revocation. Freedom Church of Revelation v. United States,588 F. Supp. 693↩ (D.D.C. 1984).
6. Petitioners also received a photocopy of the back of a tax return that was purportedly filed by another minister in the FCR. On this return was photocopied a United States Treasury check dated May 16, 1980 made payable to George L. The last name on the check and the last name on the signature line on the return were whited out. The return indicates that George L. filed this return purportedly as an agent of the church and claimed exempt status pursuant to section 3401(a)(9).↩
7. Taxation was Steve Gelb's area of expertise. Any communication that petitioners had with Mr. DeMarco's office was usually through Steve Gelb.Petitioners never spoke with Mr. DeMarco. Mr. Gelb, however, was not present at trial, and the record does not indicate the degree of his actual involvement with petitioners, except for filing their petition in this case.↩
8. We think it unlikely that petitioners executed such a power of attorney since the statutory notices of deficiency were mailed to petitioners and not to Mr. DeMarco.↩
9. Petitioners offered, and we received into evidence, a form letter signed by James V. Tamburro that contained essentially the same information as Mr. DeMarco's form letter. The letter was typed on FCR stationery and the heading indicated it was issued from the FCR's Legal Department. This letter instructed ministers to direct any questions in writing to James V. Tamburro or Chester R. Kosarek. This letter was not addressed, but space was provided for inserting the name and address of an addressee. Mr. Kitcher testified that he received the Tamburro letter in late 1980 or early 1981, but we are satisfied that he is in error on the date. The FCR did not establish its Legal Department until after Mr. DeMarco ceased representing it, which was around December of 1982. The petition in this case was signed by Mr. Gelb, bore Mr. DeMarco's name and address, and was filed with the Tax Court on October 4, 1982. That occurred before the FCR set up its Legal Department.↩
10. We have decided numerous cases involving ministers of the FCR attempting to avoid taxes by claiming sham charitable contributions or by claiming tax-exempt status under the guise of a vow of poverty. See generally Venni v. Commissioner,T.C. Memo. 1984-17; Makkay v. Commissioner,T.C. Memo. 1984-16; Poldrugovaz v. Commissioner,T.C. Memo. 1984-15; Keifer v. Commissioner,T.C. Memo. 1983-627; Lynch v. Commissioner,T.C. Memo. 1983-537; Stojalowsky v. Commissioner,T.C. Memo. 1983-236; Noberini v. Commissioner,T.C. Memo. 1983-49; Ocejo v. Commissioner,T.C. Memo. 1983-48↩.
11. Mr. DeMarco's form letter to petitioners clearly outlined the IRS audit procedures and the benefits of filing a petition in the Tax Court once a statutory notice of deficiency was issued. That letter stated, inter alia, that the filing of such a petition can be accomplished without the taxpayer first having to pay the proposed income deficiencies. Most important, the IRS cannot pursue dollection activity with respect to the alleged deficiency in income tax until a decision is entered by the Tax Court and all final appeals are either waived or denied by the higher courts. The letter concluded by indicating that any questions should be directed in writing to Mr. DeMarco, Mr. Gelb, or Mr. Zeller. There is no indication that petitioners ever submitted any questions to Mr. DeMarco or his staff. When petitioners received the statutory notices, they mailed them to Mr. DeMarco's office for a petition to be filed on their behalf. Petitioners cannot now be heard to argue that Mr. DeMarco or Mr. Gelb was not counsel of their choice. Indeed if Mr. Gelb had not timely filed the petition, IRS would have assessed the deficiencies and begun collection of the tax. Moreover, petitioners' argument that their personal situation was not considered is not borne out by the record citation given in support thereof. While Mr. DeMarco had no personal knowledge about petitioners or the filing of their particular petition, he rejected the suggestion of petitioners' counsel that such petitions were automatically filed once the statutory notices were sent to his office. Mr. DeMarco responded: Well, not at that point. I mean I hope that wasn't always done.I mean, I imagine Steve [Gelb] or Harvey [Zeller] spoke to these people before he did that and went over the situation before that was done. I mean I don't know in every case. Nor do I know on this case. Steve Gelb, with whom Mr. Kitcher admittedly talked, did not testify at the trial. The record does not indicate what Mr. Gelb told Mr. Kitcher. More importantly, the record does not indicate what, if anything, Mr. Kitcher asked Mr. Gelb. There is no indication in the record that petitioners ever sought any legal advice about their filing status or anything else. ↩
12. Of course, even if petitioners had paid the tax and pursued the refund route in their local Federal District Court or in the United States Claims Court, any election of joint filing status would still have had to be made before they "commenced a suit in any court for the recovery of any part of the tax for such taxable year." Sec. 6013(b)(2)(D). Jacobson v. Commissioner,73 T.C. 610, 614 (1979). In other words, there is a cut off for the switching privilege in any event. The cut off point is slightly different depending on the court in which suit is brought. The mailing of the statutory notice of deficiency is the cut off point if the taxpayer wishes to pursue the deficiency route (prepayment forum, i.e., the Tax Court).Sec. 6013(b)(2)(C). The filing of the refund suit is the cut off point if the taxpayer wishes to pursue the refund route (Federal District Court or Claims Court). Sec. 6013(b)(2)(D)↩.Whether petitioners would have been willing to give up their right to litigate in a prepayment forum, to pay the tax, and then to bring a refund suit just to gain some additional time (between issuance of the statutory notice and filing of the refund suit) to make their election for joint filing status is problematical. In view of the litigating position petitioners were espousing until just shortly before the trial in this Court and in view of the fact that joint filing status was an issue raised at the eleventh hour, we rather doubt petitioners would have decided to forego the benefits of a prepayment forum. Petitioners are wholly silent as to this very practical dollars and cents matter.
13. There is no evidence in the record that petitioners were given any "improper" legal advice. See nn. 11 and 12, supra. At best there is a suggestion that petitioners were not told the legal ramifications of their initial choice to file separate returns, namely, that the privilege to switch to joint filing status was not unlimited and that there were cutoff points for such a switch. Once the statutory notices were mailed to petitioners and before petitioners sent those notices to Mr. DeMarco's office, it was already too late to elect joint filing status if petitioners wanted to pursue the deficiency (prepayment) route. See nn. 11 and 12, supra.↩
14. To the extent that petitioners are arguing for equitable relief, we are without authority to consider the matter. Pesch v. Commissioner,78 T.C. 100, 130 (1982), citing Lorain Avenue Clinic v. Commissioner,31 T.C. 141, 164 (1958). "The Internal Revenue Code, not general equitable principles, is the mainspring of [the Tax Court's] jurisdiction." Hays Corp. v. Commissioner,40 T.C. 436, 443 (1963), citing Commissioner v. Gooch Co.,320 U.S. 418, 422↩ (1943).
15. At trial, petitioners contended that the entire $5,100 membership fee was expended for tax advice and legal representation and properly deductible under section 212(3). On brief, however, petitioners concede that intangible benefits were attached to the ministerial credentials they received, and petitioners arbitrarily attribute fifty percent of the $5,100 membership fee to these intangible benefits and conclude that the other fifty percent was expended for tax advice and legal representation in tax matters and therefore deductible under section 212(3)↩.
16. Petitioners have not raised and we need not consider any other basis for allowing the deduction. However, the facts show that the expenditure was not paid or incurred for the production or collection of income (sec. 212(1)) or for the management, conservation, or maintenance of any property held for the production of income (sec. 212(2)↩).
17. Moreover, the record does not explain why the check in the amount of $5,100 was annotated as "Donation-Educational" if a portion was supposedly attributable to tax advice and legal representation. In addition, the record indicates that petitioners did not consider the $5,100 payment a deductible expense at the time they made the payment incident to becoming ministers in the FCR since neither petitioner treated the expense as a deductible item when computing their 1980 taxable incomes. See Mustain v. Commissioner,T.C. Memo. 1982-670↩. 18. See Benningfield v. Commissioner,81 T.C. 408, 422 (1983); Professional Services v. Commissioner,79 T.C. 888, 917-920 (1982); Luman v. Commissioner,79 T.C. 846, 855-860 (1982); Zmuda v. Commissioner,79 T.C. 714, 724-725 (1982), affd. 731 F.2d 1417 (9th Cir. 1984); Epp v. Commissioner,78 T.C. 801, 803-807 (1982); Contini v. Commissioner,76 T.C. 447, 453-455↩ (1981).
19. Mr. DeMarco was retained by the FCR as general counsel to defend the deductibility of church donations. However, Mr. DeMarco did not become involved with these tax matters of the FCR on a regular basis until May of 1981. This was almost a year after petitioners' $5,100 payment to the FCR on June 20, 1980. In addition, Mr. DeMarco became involved with the ministers' returns only in the event of an audit. Mr. DeMarco neither rendered an opinion to petitioners regarding the deductiblity of their charitable contributions nor advised or instructed petitioners in the filing of their 1980 Federal income tax returns. Moreover, the record indicates that any tax advice and instructions that petitioners received in preparing various tax returns at the various FCR meetings were rendered by ministers of the FCR. Although the record is unclear as to how many and which FCR meetings Mr. DeMarco attended, he did not advise or instruct petitioners in the filing of their 1980 tax returns and he did not recall anyone rendering such advice or instructions at any of the meetings that he attended. Petitioners were told that Joseph Coniglione, the head of the FCR, was an accountant by profession, and they filed their tax returns according to his instructions. We disregard this hearsay, and there is no probative evidence in the record to establish that Coniglione was in fact an accountant. Although we generally consider services of accountants deductible items if such services are within the scope of section 212(3), see Surloff v. Commissioner,81 T.C. 210, 241↩ (1983), we conclude that any tax advice rendered by Joseph Coniglione or any instructions that he provided to petitioners in the filing of their income tax returns were self-serving, to say the least, and were rendered in his capacity as the head of the FCR to further this blatant tax-avoidance scheme. In any event, based on the tax returns that petitioners filed for the year in issue, any tax advice and instructions that petitioners received at these FCR meetings in the preparation of their tax returns were totally unfounded and frivolous misrepresentations.
20. We do not imply that simply "bad" tax advice rendered by attorneys or certified public accountants is a non-deductible item under section 212(3). See Collins v. Commissioner,54 T.C. 1656 (1970); Ippolito v. Commissioner,T.C. Memo. 1965-167, affd. on another issue 364 F.2d 744 (2d Cir. 1966), cert. denied 385 U.S. 1005 (1967). But see Crowder v. Commissioner,T.C. Memo. 1984-543, on appeal (9th Cir., June 25, 1985), where we suggested that section 212(3) requires legitimate↩ tax advice or tax planning.
21. Sec. 7451. FEE FOR FILING PETITION. The Tax Court is authorized to impose a fee in an amount not in excess of $60 to be fixed by the Tax Court for the filing of any petition for the redetermination of a deficiency or for a declaratory judgment under part IV of this subchapter or under section 7428 or for judicial review under section 6226 or section 6228(a). We note that the fee for filing a petition with the Tax Court in the year that petitioners joined the FCR was $10. Section 7451 was amended by striking out "$10" and inserting "$60," applicable to petitions filed after December 31, 1981. Economic Recovery Tax Act of 1981, Pub.L. 97-34, § 751, 95 Stat. 349. ↩
22. At best, petitioners were entitled to legal representation only in the event the Internal Revenue Service questioned the deductibility of the charitable contributions to the FCR on their returns. Such services could have been performed only in years subsequent to 1980, and the cost of any such services was not ascertainable in 1980. Although petitioners have not established an ascertainable fair market value of Mr. DeMarco's services, we conclude that the value of such services is at best de minimis. The cost of filing a petition with the Tax Court at the time petitioners paid the $5,100 to the FCR was $10. See n. 21, supra.↩ In addition, except for filing the petition in this case and requesting a place for trial, Mr. DeMarco's firm made no other appearances on record and took no other action on petitioners' behalf.