T.C. Memo. 2000-22


UNITED STATES TAX COURT


JOSEPH J. HOUSE, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

JOSEPH J. HOUSE INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 8664-98, 8665-98.          Filed January 19, 2000.


     P is a former revenue agent with the Internal
Revenue Service and has been a return preparer for over
28 years.  P set up J-Co., a wholly owned corporation,
purportedly to conduct his accounting business.  P also
set up C-Co. to hide his assets from the Internal
Revenue Service and X-Co. for his wife's arts and
crafts business.  P conducted his accounting business
at his personal residence.  P's clients hired him
individually to prepare their returns.  P was not an
employee of J-Co. and was not acting on J-Co.'s behalf
when servicing clients.  J-Co. did not engage in a
substantive business activity.  Neither P nor his
family members maintained personal checking accounts.
P deposited all his gross receipts into J-Co.'s account
and paid all his business and personal expenses from
this account without maintaining adequate records to
differentiate between business and personal items.  P

also transferred funds from this account to the accounts of C-Co. and X-Co. to allow other family members to use the funds for personal purposes. P reported all receipts from his accounting services on J-Co.'s return, then deducted all business and personal items therefrom, disguising most of the items as "cost of goods sold". J-Co. paid no tax. P did not report any income from J-Co. on his return for 1994, nor did he report income from the payment of personal expenses. Held: J-Co. is a sham, and we disregard it for tax purposes. Petitioner's gross receipts, less allowable business expenses, are includable in his income. Held, further: P is liable for the fraud penalty under sec. 6663, I.R.C.

Joseph J. House, pro se.

John J. Comeau, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LARO, Judge: These cases are before the Court consolidated for purposes of trial, briefing, and opinion. Joseph J. House (petitioner) and Joseph J. House, Inc. (JJH) separately petitioned the Court to redetermine respondent's determinations of the following deficiencies in Federal income tax, addition to tax, and accuracy-related penalties:

Joseph J. House, docket No. 8664-98

| Year | Deficiency | Accuracy-related penalty Sec. 6662(a) |
|------|-----------|---------------------------------------|
| 1994 | $32,921 | $6,584 |

Joseph J. House Inc., docket No. 8665-98

| Year ended June 30 | Deficiency | Addition to tax Sec. 6651(a)(1) | Accuracy-related penalty Sec. 6662(a) |
|---|---|---|---|
| 1994 | $39,723 | $9,931 | $7,945 |

By amendment to answer in docket No. 8664-98, respondent affirmatively asserted that petitioner was liable for an increased deficiency in tax and that petitioner was liable for the fraud penalty.[1]  On brief, respondent conceded the deficiency in tax, addition to tax, and accuracy-related penalty in docket No. 8665-98.  Following concessions of the parties, we decide the following issues:

1.  Whether petitioner had unreported income for 1994 related to his accounting business.  We hold he did to the extent set forth herein.

2.  Whether petitioner is liable for the fraud penalty.  We hold he is.

Unless otherwise indicated, section references are to applicable provisions of the Internal Revenue Code, Rule references are to the Tax Court Rules of Practice and Procedure, and dollar amounts are rounded.

---

[1]Respondent asserted in his amendment to answer that petitioner failed to report $156,197 in gross receipts instead of $77,550 as determined in the notice of deficiency, and he asserted that the entire deficiency resulting therefrom was attributable to fraud.  Respondent did not set forth a specific dollar amount for the increased deficiency or the fraud penalty, stating that the amounts were computational.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulated facts and exhibits submitted therewith are incorporated herein by this reference. Petitioner resided in Lockport, Illinois, when he petitioned the Court.

Petitioner has been an accountant and tax return preparer for over 28 years, and he has a bachelor's degree in accounting from Lewis College in Lockport, Illinois. Petitioner worked as a revenue agent for the Internal Revenue Service (the Service) for 5 years in the 1970's. While he was at the Service, his duties included auditing Federal income tax returns of individuals and corporations. Petitioner has prepared thousands of Federal income tax returns in his career, and he is knowledgeable about the Federal income tax laws. Petitioner has also set up hundreds of corporations for various individuals, and he serves as registered agent for at least 163 of these corporations.

Petitioner is married to Charlene House (Charlene), and they have two sons, Craig House (Craig) and Tim House (Tim). Craig was a construction worker in 1994, and he built at least two homes during 1992 through 1994. Tim was a college student at the University of Central Florida in 1994. During all relevant times, petitioner, Charlene, and Craig lived at 210 Muehl, Lockport, Illinois (Muehl residence). The Muehl residence was

owned by Lewis Simmons (Simmons), who rented the residence to petitioner.

Petitioner incorporated JJH in 1985 purportedly to conduct his tax return preparation business. At all relevant times, JJH's address and business location were at the Muehl residence. The Muehl residence has three levels: A basement, a main floor, and an upstairs floor where the bedrooms are located. Petitioner conducted his return preparation business in the basement, and he saw clients at his office in the basement.

Tim has been collecting Walt Disney toys and characters since he was very young, and his collection today includes numerous figurines and other collectible items of a variety of sizes and types (Disney collection). Petitioner is similarly intrigued with Mickey Mouse, Donald Duck, and the Walt Disney fantasy, and he enjoys sharing his affinity for these characters with others.[2] When Tim left home for college, he left behind his Disney collection, and petitioner displays the Disney collection throughout the basement where he meets tax and accounting clients.

During all relevant periods, petitioner was the beneficial owner of all JJH's stock. Petitioner did not have an employment contract with JJH, and he was not an employee of JJH. JJH had no

---

[2]For example, petitioner submitted his brief to the Court on a diskette bearing Mickey Mouse's image.

employees and no officers or directors.  When clients obtained
petitioner's services, they did not execute an engagement
contract with JJH, and the clients did not recognize JJH as the
service provider.  JJH did not have a rental agreement for its
office space from Simmons; Simmons had a verbal agreement with
petitioner to rent the entire house to petitioner.  JJH did not
engage in a business activity.

Charlene made fabric and wood country crafts that she sold
to craft malls.  Petitioner and Charlene incorporated Char's
Country Accents, Inc. (CCA), in 1986 to operate this business.
Charlene and Craig were the owners and officers.  CCA's address
and location were at the Muehl residence.

In 1987, petitioner incorporated an entity he called Coastal
Leasing (Coastal) to conceal his assets from the Service.
Coastal's address was the Muehl residence.  Coastal did not
conduct any business activity, and petitioner used Coastal to
circulate funds among and between his other entities and his
family members.  By 1994, petitioner allowed Craig to operate his
construction activities under the Coastal name to give the
appearance that Craig was a mature individual with his own
construction company.

The Bank Accounts

Neither petitioner, Charlene, nor Craig maintained any personal checking accounts of any kind. Petitioner transferred funds freely among JJH, CCA, and Coastal, as he saw fit.

1. JJH Account—Petitioner opened an account in the name of JJH in 1985 (JJH account) over which he had signature authority, and this account remained open throughout 1994. Petitioner used the JJH account as his personal and business account, and he paid all business and personal expenses from this account. Charlene also had access to the account and used it to pay some of her personal expenses. Petitioner deposited all income generated from his return preparation business into the JJH account. Petitioner did not designate what amounts in the account, if any, were salary or other income to him, and he did not document whether expenses paid from the account were business or personal. Petitioner commingled his personal income and expenses with his business income and expenses without limitation.

As relevant herein, petitioner wrote a total of $150,208 in checks from the JJH account. Of the total, $47,105 related to expenses of operating petitioner's return preparation business, and the $103,103 balance related to personal living expenses of petitioner and his family.

For 1994, total deposits to the JJH account were $176,547, comprising $144,812 in gross receipts and $31,735 in transfers from CCA's and Coastal's accounts. Petitioner withdrew virtually

all of those deposits by either check or withdrawal, leaving a 1994

ending balance of $853.  The following is a summary of the checks

drawn on the JJH account during 1994:

| PAYEE/CATEGORY | AMOUNT | PERSONAL | BUSINESS |
|---|---|---|---|
| Petitioner | $4,680 | $4,680 | -0- |
| Charlene | 7,725 | 7,725 | -0- |
| Coastal | 18,525 | 18,525 | -0- |
| CCA | 8,375 | 8,375 | -0- |
| Craig | 1,950 | 1,950 | -0- |
| Tim | 14,454 | 14,454 | -0- |
| Walt Disney World | 4,869 | 4,869 | -0- |
| Utilities[1] | 6,768 | 4,125 | $2,643 |
| Lewis Simmons[2] | 8,780 | 5,853 | 2,927 |
| Internal Revenue Service | 4,570 | 4,570 | -0- |
| Other[3] | 63,514 | 21,979 | 41,535 |
| Total | 144,210 | 97,105 | 47,105 |

[1]The total electric, gas, and water bills of the Muehl residence were $3,948.  We allocate one-third to business use and two-thirds to personal use as there are no separate meters for the basement of the residence, and petitioner has provided no credible evidence that this allocation, which was proffered by respondent, is improper.  The balance of the utilities expense comprises telephone expenses allocated $1,362 to personal use and $1,458 to business use.

[2]This represents rent for the Muehl residence, allocated one-third to business and two-thirds to personal.

[3]We allocate the following payment categories 100 percent to personal:  River Park Apts, $1,360; insurance, $8,631; medical, $2,130; misc. expenses petitioner admits are personal, $3,621. We allocate the following payment categories 100 percent to business:  Charles Losa, $5,276; Tax Court, $300; Dir. of Labor, $39; misc. payments, $10,581; Office Max, $598; S.W. Financial, $1,818; various individuals, $3,677; Cindy Manzzi, $4,485; Postmaster, $2,526.  On the basis of a reasonable estimation and lack of exact substantiation in the record, we allocate the following payment categories 50 percent to business and 50 percent to personal (amount stated is the total expense):  Credit cards, $6,468; Hintze Auctions, $4,360; cable, $953; automotive related, $12,690.

None of the above personal expenses were ordinary and necessary business expenses of JJH or petitioner. The checks to petitioner, Charlene, Coastal, CCA, and Craig were for the personal use of petitioner and his family. The checks to Tim and the University of Central Florida were for Tim's tuition, room and board, and other college expenses. The automotive expenses included petitioner's monthly car payments, payments for gas, and car maintenance expenses. The payments to the IRS were payments for petitioner's and Craig's Federal income tax obligations.

2. CCA's Account—CCA had a checking account over which petitioner and Charlene had signatory authority. Charlene used this account as her personal checking account. The deposits to this account during 1994 included $16,100 in checks from JJH written to Charlene and CCA and $9,000 in checks from Coastal. Charlene also deposited receipts from her craft business into this account, but she did not know what portion of the deposits these receipts were. During 1994, Charlene wrote approximately $30,569 in checks from this account, including $9,400 in checks to JJH, $7,700 in checks to Charlene or Coastal, and other miscellaneous checks to cover personal living expenses.

3. Coastal's Account—Coastal had a checking account over which Charlene and Craig had signatory authority, but petitioner was in control of the account, and Charlene and Craig obtained petitioner's approval before using the funds. The Coastal

account served primarily as a "clearing account" through which petitioner circulated funds for the purpose of paying Craig's personal and construction expenses, and other personal expenses of petitioner's family. During 1994, the deposits into Coastal's checking account consisted of primarily checks written from JJH and also included checks from CCA and a small amount of unidentified deposits. The transfers from JJH's account were not loans, and the transfers were not related to petitioner's accounting business.[3] Craig used the funds in the Coastal account to pay some of his personal living and construction expenses and to funnel money to other family members. During 1994, Craig wrote a total of $39,863 in checks from this account, including $22,335 in checks to JJH and $11,920 in checks to petitioner, Charlene, CCA, and Craig.

Tax Reporting

Petitioner—Petitioner filed a 1994 income tax return claiming married filing separate status. Charlene did not file a return for 1994. On his 1994 return, petitioner reported no salary, wages, dividends, or other compensation from JJH. He reported total income of $31,500, comprising $1,000 Schedule C income, $10,000 rent income, $3,000 capital gain income, and $17,500 as income from a covenant not to compete. On the

_____

[3]Petitioner admitted these transfers were made "on the basis of an affinity, of a relationship" between him and his family.

Schedule C attached to his return, petitioner stated that he was an "accountant", and that his business name was "House Accountant". Petitioner failed to provide a complete business address but stated his office was in Lockport, Illinois.

JJH—Petitioner prepared and filed returns for JJH for the fiscal years ending June 30, 1994 and 1995, reporting that the business activity of JJH was "sales" and the product or service was "process". For these years, petitioner reported the gross receipts from his accounting business on JJH's returns, reporting gross receipts of $156,197 and $152,340, respectively. These gross receipts equaled the total deposits into the JJH account for both years.[4] In reporting the total bank deposits as gross receipts, petitioner was aware he was including transfers from CCA's and Coastal's accounts. In each year, petitioner claimed on JJH's return deductions and cost of goods sold in excess of the gross receipts, and JJH paid no tax in either year. The claimed deductions and cost of goods sold included the checks drawn for business and personal items of $150,208 as set forth above for calendar year 1994.

CCA's Returns—Petitioner prepared and filed a return on behalf of CCA for 1994, reporting gross receipts of $66,994, expenses and cost of goods sold of $68,358, and no taxable

---

[4]For the calendar year 1994, the reported gross receipts equal the $176,547 in deposits identified above.

income. Charlene had no idea what these figures comprised or whether the reported gross receipts, expenses, and cost of goods sold were accurate. Most of the $68,358 claimed on CCA's return was listed as cost of goods sold, and a large portion of the cost of goods sold figure represented personal living expenses of petitioner and Charlene.[5]

Coastal's Return—Petitioner prepared and filed Coastal's returns for fiscal years ended June 30, 1994 and 1995, reporting as gross receipts $23,056 and $94,952, respectively. In both years, the reported expenses exceeded the reported gross receipts, and Coastal reported no taxable income and paid no tax. Craig signed the returns but had no idea where the reported income came from or whether it was accurate. The reported gross receipts comprised primarily checks and transfers from JJH's account to Coastal.

The Audit

Revenue Agent Ruby Townsend (Townsend) conducted the audits of petitioner's and JJH's returns at issue. Petitioner was uncooperative with Townsend. Townsend repeatedly requested to meet with petitioner and requested that petitioner provide documents to substantiate the items on his return and JJH's

---

[5]Charlene admitted that she used the funds in the CCA account for personal purposes, and there is insufficient evidence in this record to determine what items, if any, were business related.

return.  After refusing several times to meet with Townsend, petitioner reluctantly appeared for a meeting wherein he provided no documents.

Respondent's Determination

Respondent determined petitioner had unreported income in 1994 of $81,879, computed as follows:

| | |
|---|---:|
| Deposits to JJH's account | $176,547 |
| Less: Transfers from CCA | (9,400) |
| Less: Transfers from Coastal | (22,335) |
| Total gross receipts | 144,812 |
| Less:  Business expenses | (31,433) |
| Taxable income | 113,379 |
| Less:  Reported income | (31,500) |
| Unreported Income | [1]81,879 |

[1]This figure is respondent's revised determination set forth on brief and is less than the amount he set forth by amendment to answer.

Respondent determined that JJH is a sham and should be disregarded for tax purposes, or, alternatively, that petitioner improperly assigned his income to JJH.

OPINION

Economic Reality of JJH

Petitioner was a knowledgeable former Internal Revenue Service agent who devised a deceitful plan to divert and disguise his income and used his insight and skill in an attempt to avoid detection.

We first decide whether JJH should be disregarded for tax purposes. According to respondent, it should because it lacked economic substance and is a sham. We agree. The burden of proof is split in this case. Petitioner has the burden of proof as to the $77,550 in unreported income respondent determined in the notice of deficiency. See Rule 142(a). Respondent has the burden of proof as to the $4,328 increase in unreported income[6] and as to fraud. See Rule 142(a) and (b).

There is no dispute that JJH was properly organized under Illinois law. However, even though a corporation is organized under the laws of a State, we may disregard it for Federal tax purposes if it is no more than a vehicle for tax avoidance and void of a legitimate business purpose. See Gregory v. Helvering, 293 U.S. 465 (1935); American Sav. Bank v. Commissioner, 56 T.C. 828, 838 (1971); Aldon Homes, Inc. v. Commissioner, 33 T.C. 582 (1959). While a taxpayer is free to adopt the corporate form of doing business, a corporation must engage in some meaningful business activity to be recognized as a separate entity for tax purposes. See Moline Properties, Inc. v. Commissioner, 319 U.S. 436 (1943); Achiro v. Commissioner, 77 T.C. 881 (1981). Avoiding taxation is not a business activity. See National Carbide Corp.

---

[6]On brief, respondent maintains that petitioner's unreported income was $81,879, leaving respondent with the burden of proof on $4,328, the excess over the $77,550 determined in the notice of deficiency.

v. Commissioner, 336 U.S. 422, 437 n.20 (1949); Higgins v. Smith, 308 U.S. 473 (1940); Gregory v. Helvering, supra.  On this record, we find that JJH lacked economic substance and was merely a paper entity that engaged in no meaningful business activity.

The purported purpose of JJH was to render accounting services, yet it had no employees to carry out this purpose.[7] Petitioner admits he was not an employee of JJH, testifying at trial:  "As Joseph J. House, the individual, I was not an employee.  I did not consider myself an employee of Joseph J. House, Inc.  I considered myself an independent contractor".  To the extent petitioner suggests he was acting on behalf of JJH as an independent contractor, we are not persuaded.  Petitioner was acting on behalf of himself individually when he rendered services to clients.  There was no employment or agency contract between petitioner and JJH.  There is no credible evidence that there was a relationship between JJH and petitioner's clients or that the clients recognized JJH as the service provider.  The relationship was directly between petitioner and his clients.  Petitioner's clients paid petitioner directly.  JJH did not pay petitioner compensation for his services and did not issue him a Form 1099 or W-2.  To embrace petitioner's argument, we would

---

[7]Petitioner reported a negligible amount of wages paid on JJH's returns but does not argue these wages were paid to him, and the record does not disclose who purportedly earned them. Petitioner has not suggested that JJH's payment of personal expenses constitutes compensation.

have to find that he worked for JJH without compensation.  We decline to do so.

Petitioner did not respect the separateness of JJH, and he commingled his income and expenses with JJH's.  Petitioner maintained no personal checking accounts, and he treated JJH's account as his own.  Petitioner had dominion and control over the account, and he readily admits that he used it as his own, boasting at trial:  "my home, my style of living, is paid for by Joseph J. House, Inc.", and that "personal checkbooks are not a good thing".  See Denali Dental Services v. Commissioner, T.C. Memo. 1989-482 (corporation a sham where its checking account was used as a "pocketbook" for payment of shareholder's personal expenses).  JJH did not keep separate books and records of the deposits, checks, transfers, or withdrawals from JJH's account to differentiate between business and personal income and expenses.  Instead, petitioner treated his affairs as one and the same with JJH's.

JJH had no management other than petitioner, and petitioner acknowledged that he was in complete control of JJH. Petitioner's contention that Charlene and Craig were officers of JJH does not stand up in the face of the evidence, which shows that they had nothing to do with its activities.  In discussing the use of the family corporations, petitioner admitted that "This whole operation, this whole function, is my responsibility

* * *. These people [Charlene and Craig] don't understand what's going on. They're part of it, they benefit from it, and they don't understand". Charlene's testimony corroborates petitioner's admission as she was obviously unfamiliar with JJH. Charlene did not know what JJH's assets were, and she had no idea whether it operated at a profit or loss. What Charlene did know about JJH was that it had a checking account from which she could withdraw funds. Her knowledge about JJH's affairs stopped there. Craig knew even less about JJH, admitting that he does not recall how or why he became an officer and that petitioner just said "this is what we'll do". Petitioner's attempt to lend legitimacy to the arrangement by naming his family members as officers of JJH is unavailing.

JJH did not contract with Simmons for rental of the Muehl residence; petitioner did, and Simmons believed the rent checks were personal payments from petitioner. Petitioner prepared Simmons' tax returns, and Simmons considered petitioner individually his "tax person". JJH did not have services or utilities (e.g., telephone and electric) billed in its name, and there is no other credible evidence that it contracted with third parties or held itself out to the public as a business. The only activity in which JJH engaged was receiving, spending, and circulating the funds earned by petitioner. JJH was essentially a conduit through which petitioner moved funds. Petitioner

admitted JJH "repetitively and continuously, in the normal course of its business, transfers money to account of Coastal Leasing; it transfers money to the account of Char's Country Accents; transfers money to and from Joseph Craig House, the individual". We find no business purpose for this circular flow of funds.

In substance, there really was no JJH; there was only petitioner. Petitioner recognized JJH once a year, at tax time, and the fact that petitioner so recognized it and filed returns on its behalf fails to legitimize its existence. As outlined above, JJH was little more than a clearing account through which petitioner moved funds, and the returns were the vehicle through which petitioner improperly reported the flow of funds and payment of personal expenses to avoid taxes. Petitioner did not respect the separateness of JJH, nor do we. We disregard JJH for tax purposes, and we hold that petitioner had unreported income in the amount of $66,207 determined as follows:

| | |
|---|---|
| Deposits to JJH's account | $176,547 |
| Less: Transfers from CCA | (9,400) |
| Less: Transfers from Coastal | (22,335) |
| Total gross receipts | 144,812 |
| Less: Business expenses | (47,105) |
| Taxable income | 97,707 |
| Less: Reported income | (31,500) |
| Unreported income | [1]66,207 |

[1]This figure is less than the unreported income figure of $81,879 advanced by respondent on brief because of our finding petitioner is entitled to additional business expenses.

We sustain respondent's determination of unreported income to the extent of $66,207.

Petitioner maintains that buried somewhere in JJH's large cost of goods sold figure are several other business expenses which are deductible, in addition to the expenses of $47,105 allowed above.  We have carefully reviewed all arguments made by petitioner as to his expenses, and we are unpersuaded that he had business expenses greater than the amounts decided herein.  For example, petitioner argues that in 1990, JJH obtained a covenant not to compete from petitioner for $105,000 to be paid over a 6-year period, and that $17,500 of the cost of goods sold represents a payment under the covenant.  Purportedly, petitioner sold his stock in JJH to a friend, Charles Losa (Losa), in exchange for $1,000 and a covenant not to compete.[8]  We are unpersuaded and find petitioner's testimony and documentary evidence on this point not credible.  We have already found that petitioner remained the beneficial owner of the JJH stock at all times, and petitioner's contention that he transferred anything other than nominal title to the stock is not credible.  Losa admitted that he was a shareholder in "name only" and that the transfer was effected to get assets out of petitioner's name

---

[8]The purported covenant provides that petitioner will not compete with JJH for 6 years within a 50-mile radius of the Muehl residence.  Petitioner is precluded from engaging in the following activities: "Accounting Work, Bookkeeping, Financial Consulting, Tax Preparation & Advice, Consulting, Service".

because of his tax problems. Further, the purported covenant is an unsigned document with no effective date, and it does not identify to whom the covenant is granted. Most telling, petitioner's conduct belies the existence of the covenant. He engaged in an accounting and tax business within the prohibited territory during the entire prohibited period. Petitioner's contentions as to the covenant are meritless.

Petitioner attempts to legitimize the payments made by JJH to Tim and the University of Central Florida by arguing the payments were attributable to a lease between JJH and Tim for the use of Tim's Disney collection. Petitioner asserts that JJH made payments for the lease of Mickey Mouse, Donald Duck, Goofy, and other colorful Disney characters in his basement office as bona fide business expenses. Petitioner's story is as fantastic as the Disney characters themselves. Petitioner did not know the value of the collection or how many items were in the collection, and there is no evidence the Disney collection furthered any advertising goal. Charlene's testimony that she engaged in bona fide negotiations with Tim with respect to a lease price on New Year's Day in 1993 is not credible. The lease document is concocted and back dated, and the stated rent of $1,000 per month bears no relation to the actual payments made to Tim or to the University of Central Florida.

Petitioner argues that the payments by JJH to CCA, Coastal, and Craig were deductible because JJH transferred funds to these entities "in the normal course of its business".  We disagree. Petitioner has put forth no credible evidence that these payments by JJH to these entities or to Craig are deductible.  To the contrary, petitioner's own statements support our finding that the funds were circulated without a business purpose to fund petitioner's personal expenses.  We reject petitioner's argument that the amounts paid to Simmons are deductible interest payments.  Simmons admitted he rented the Muehl residence to petitioner, and the fact that Simmons reported the payments from petitioner as "interest" on his return is unpersuasive since it was petitioner who prepared this return.  Finally, petitioner argues generally that all amounts paid by JJH are deductible because "Personal living expenses, when provided by an employer, are not income to the person who receives it".  Petitioner's argument is without merit, and, on the basis of his knowledge and experience, petitioner knows it.  We find all other testimony and evidence not discussed herein in favor of additional deductions to be unpersuasive or incredible.

Fraud Penalty Under Section 6663

We turn now to the fraud penalty.  Respondent bears the burden of proving by clear and convincing evidence that petitioners are liable for the penalty for fraud.  See sec.

7454(a); Rule 142(b); <u>Toussaint v. Commissioner</u>, 743 F.2d 309, 312 (5th Cir. 1984), affg. T.C. Memo. 1984-25; <u>Wright v. Commissioner</u>, 84 T.C. 636, 639 (1985). Respondent must meet this burden through affirmative evidence because fraud is never imputed or presumed. See <u>Toussaint v. Commissioner</u>, <u>supra</u> at 312; <u>Beaver v. Commissioner</u>, 55 T.C. 85, 92 (1970). The existence of fraud is a question of fact to be resolved from the entire record. See <u>Gajewski v. Commissioner</u>, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Petitioners' entire course of conduct can be indicative of fraud. See <u>Stone v. Commissioner</u>, 56 T.C. 213, 224 (1971); <u>Otsuki v. Commissioner</u>, 53 T.C. 96, 105-106 (1969).

To satisfy his burden of proof, respondent must show two things. First, respondent must prove that an underpayment exists. Respondent may not rely on petitioner's failure to disprove a deficiency determination to satisfy this element. See <u>Drieborg v. Commissioner</u>, 225 F.2d 216, 218 (6th Cir. 1955), affg. in part a Memorandum Opinion of this Court; <u>Parks v. Commissioner</u>, 94 T.C. 654, 660-661 (1990); <u>Petzoldt v. Commissioner</u>, 92 T.C. 661, 700 (1989). Second, respondent must show that petitioners intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. See <u>Stoltzfus v. United States</u>, 398 F.2d 1002, 1004 (3d Cir. 1968); <u>DiLeo v. Commissioner</u>, 96 T.C. 858,

874 (1991), affd. 959 F.2d 16 (2d Cir. 1992); Rowlee v.

Commissioner, 80 T.C. 1111, 1123 (1983).

To satisfy the first prong, there must be clear and convincing evidence to support respondent's determination of an underpayment; i.e., clear and convincing evidence that JJH was a sham and that the income generated from petitioner's accounting services belonged to him. This prong must be satisfied with affirmative proof, and a taxpayer's failure to meet his or her burden of proof alone will not suffice. We find such clear and convincing evidence here. Much of this evidence came directly from petitioner's own testimony, including petitioner's admissions that: He was not an employee of JJH; he paid his personal expenses from JJH's account; the purported officers of JJH, Charlene and Craig, knew nothing about JJH; he moved funds in a circular manner among the accounts of JJH, CCA, and Coastal; and he fabricated the numbers and categories on his 1994 return (see discussion of fraud below). These admissions together with the other evidence detailed under our discussion of the deficiency are clear and convincing affirmative evidence that petitioner underpaid his 1994 taxes.

With respect to the second prong of the fraud test; i.e., that petitioner had the requisite fraudulent intent, fraud may be proven by circumstantial evidence because fraud can rarely be established by direct proof of the taxpayer's intention. See

Rowlee v. Commissioner, supra at 1123. Courts have developed various factors or "badges" which tend to establish fraud. Some of the "badges of fraud" are: (1) Understating income, (2) maintaining inadequate records, (3) failing to file tax returns, (4) giving implausible or inconsistent explanations of behavior, (5) concealing assets, (6) failing to cooperate with tax authorities, (7) engaging in illegal activities, (8) attempting to conceal activities, (9) dealing in cash, and (10) failing to make estimated tax payments. See Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. T.C. Memo. 1984-601; Clayton v. Commissioner, 102 T.C. 632, 647 (1994). We consider this list nonexclusive, and we take into account all the unique facts and circumstances of every case in determining whether fraudulent intent exists.

After examination of some of the applicable factors above as well as other factors in this case, we conclude respondent has satisfied his burden of proving fraud. Petitioner is a former Internal Revenue Service agent, which gives him insight into audit techniques and the Service's means of detecting inaccurate returns. He has practiced as a return preparer and accountant for over 20 years, and he is knowledgeable about tax law. Petitioner put his knowledge and insight to use and tried to disguise his income to underpay his taxes, and he tried to circumvent detection of his deceit by the Service. In filing his

return for 1994, petitioner knew he was not reporting his income from his accounting business or the income attributable to JJH's payment of his personal expenses, and he knew this was contrary to the tax law. See Taxpayers Assistance Corp. v. Commissioner, T.C. Memo. 1988-343 (taxpayer's background and experience taken into account as evidence of fraud).

Petitioner used JJH, CCA, and Coastal to conceal his income and personal expenses. The corporations were a critical part of his scheme. Petitioner frequently circulated funds among JJH, Coastal, and CCA for no business purpose and then used the funds in these accounts to pay personal expenses. JJH's and Coastal's bank accounts were petitioner's and Charlene's personal pocketbook. CCA's bank account was also Charlene's personal pocketbook, and petitioner funneled money from JJH and Coastal to this account to fund Charlene's expenditures. The use of a corporation to disguise the personal nature of income and expenses is evidence of fraud. See Truesdell v. Commissioner, 89 T.C. 1280, 1302-1303 (1987); Benes v. Commissioner, 42 T.C. 358, 383 (1964), affd. 355 F.2d 929 (6th Cir. 1966).

Petitioner claimed the living expenses detailed in our findings of fact as business expenses on JJH's return, concealing them as cost of goods sold. Petitioner deliberately mischaracterized JJH's business activity on its returns to create the appearance JJH was a merchandise business rather than a

service business, stating that JJH's business activity was "sales", and that the product or service was "process".  In so mischaracterizing, petitioner intended that a large portion of the personal expenses be buried in cost of goods sold, minimizing the possibility that the personal nature of the expenses would be detected.[9]  These claims were false and petitioner knew it.[10] Petitioner's testimony that "any personal expenses that are paid by the corporation are not deducted by the corporation" is not credible.  Finally, petitioner's failure to include in his income JJH's payment of his personal expenses resulted in a large understatement of his income.

Petitioner failed to maintain adequate records of his income and expenses.  Petitioner maintained three corporate checking accounts from which he paid all business and personal expenses, and he maintained no records to determine which expenses were business or personal.  The records petitioner did keep were inadequate.  Petitioner purportedly maintained a ledger for his "draw account" from JJH.  This ledger recorded negligible amounts as "drawn" by petitioner, did not include JJH's payment of the

---

[9]Petitioner was aware that the largest expense of a merchandising business is generally cost of goods sold, and he knew a large cost of goods sold was less likely to "red flag" his return than larger expenses elsewhere on the return.

[10]As just one example, petitioner admitted that the insurance paid by JJH to Prudential was a personal expense, and that he deducted it anyway, stating:  "It's not probably technically, in the truest accounting sense a good thing to do".

personal expenses, and did not correlate with the numbers on petitioner's return.

Petitioner admits he engaged in a pattern of concealing assets from the Service, and he was not reluctant to acknowledge his disdain for paying taxes, bragging at trial that he formed Coastal to hide his assets from the Service.

Petitioner failed to cooperate during the audit, and his claim that the flood of the Muehl residence prevented him from so doing is not credible. The flood did not destroy relevant documents requested by respondent, such as bank statements, canceled checks, or deposit slips, as evidenced by the fact petitioner was able to produce these documents close to trial.

Petitioner precisely included in the income of JJH all amounts deposited into its bank account, notwithstanding the fact that he knew he was including transfers between accounts and double counting income.[11] Petitioner points to this as evidence there was no intent to deceive. To the contrary, this was part of the deception plan. Petitioner admitted that he knew a tax auditor would always compare bank statements with reported receipts. Petitioner's ensuring that the numbers matched was his attempt to deceive the Service into believing his return and

---

[11]Petitioner testified: "Now, the problem with that income is that it includes transfers and/or loans and/or exchanges of money between those corporations of Joseph House, Coastal Leasing and Char's".

JJH's return were accurate. This double counting of income was of no consequence to petitioner since he managed to manipulate the numbers on all returns to the point where there was little to no taxable income.

Petitioner intentionally mischaracterized items of income on his 1994 return. He reported total income of $31,500, comprising $1,000 Schedule C income, $10,000 rent income, $3,000 capital gain income and $17,500 as income from a covenant not to compete. At trial, he admitted these categories were all concocted, stating: "I don't mind giving you [IRS] the elbow, but I'm not going to lie to him [the Court]". Petitioner mischaracterized his income to avoid self-employment tax and to deter the Service from discovering unreported income related to JJH. Petitioner's lack of candor was prevalent throughout the discovery process and trial.[12]

Petitioner filed a separate return to avoid payment of taxes on the unreported income in the event he got caught.[13]

_____

[12]By interrogatory, respondent asked why JJH paid the University of Central Florida, and petitioner stated the payments were for "equipment rental". When questioned on cross-examination about why JJH paid petitioner's personal living expenses, petitioner stated: "I've got to live somewhere".

[13]Charlene did not file and testified that she bought her husband out of JJH and took his name off everything including the CCA signature card because of the IRS collection activity. In avoiding the joint and several liability of a joint return, petitioner hoped to remain free to transfer assets and income to Charlene to frustrate the Service's collection activities.

Petitioner's attempt to legitimize JJH's payment of personal expenses with his fabricated Disney collection lease story and the covenant not to compete story is further evidence of petitioner's fraudulent intent. These concocted stories show petitioner does not hesitate to manufacture facts and events to further his interests.[14]

Petitioner's fraudulent scheme was not just a family affair, and he recommended it to others. He set up 163 corporations for other taxpayers. In at least one such case where the Service challenged the personal expenses paid by the corporation and deducted as cost of goods sold, petitioner advised his clients to settle, stating: "Hey, we got away with it for ten years, it's time". At trial, petitioner proudly stood by his prior statement, bragging: "it was good advice then and I stand by it now".

We conclude on this record that "it's time" for petitioner also. Respondent has proven by clear and convincing evidence that petitioner underreported his income in 1994 with the fraudulent intent of evading taxes. We sustain respondent's determination as to fraud.

---

[14]Petitioner similarly disliked having to pay out-of-State tuition for Tim at the University of Central Florida, so he perpetuated the Disney collection lease scheme to create the appearance that Tim was self-sufficient and had fixed income. This allowed Tim to obtain residency status for tuition purposes.

We have considered all other arguments advanced by petitioner for a contrary result and, to the extent not discussed herein, find them to be irrelevant or without merit.

<u>Decision will be entered under</u>

<u>Rule 155 in docket No. 8664-98;</u>

<u>decision will be entered for</u>

<u>petitioner in docket No. 8665-98.</u>